Filed 2/24/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SHASHIKANT JOGANI,<br><br>    Plaintiff, Cross-defendant and Respondent,<br><br>    v.<br><br>HARESH JOGANI et al.,<br><br>    Defendants, Cross-defendants and Appellants;<br><br>AKSHI INVESTMENTS LIMITED,<br><br>    Cross-defendant and Appellant;<br><br>RAJESH JOGANI et al.,<br><br>    Defendants, Cross-complainants and Respondents;<br><br>SHAILESH JOGANI,<br><br>    Defendant, Cross-defendant and Respondent. | B338590 consolidated with B340239 and B342005<br><br>(Los Angeles County Super. Ct. No. BC290553) |

APPEALS from judgments and orders of the Superior Court of Los Angeles County, Susan Bryant-Deason, Judge. Conditionally affirmed and modified in part; dismissed in part.

Stris & Maher, Peter K. Stris, Tillman J. Breckenridge; Milbank, Neal Kumar Katyal, Kristina Alekseyeva, Mackenzie Austin; Hogan Lovells US, Sean Marotta, Danielle Desaulniers Stempel and Sam Zwingli for Defendants, Cross-defendants and Appellants Haresh Jogani, H.K. Realty, Inc., J.K. Properties, Inc., Commonwealth Investments, Inc., Moorepark Holdings Limited, and Gilu Investments, and Cross-defendant and Appellant Akshi Investments Limited.

Reed Smith, Raymond A Cardozo, David J. de Jesus, Corinne Fierro, Kathryn M. Bayes; Friedman[2], Steven R. Friedman and Michael E. Friedman for Plaintiff, Cross-defendant and Respondent Shashikant Jogani.

Ross, Peter W. Ross and Charles Avrith for Defendants, Cross-complainants and Respondents Rajesh Jogani and Chetan Jogani.

Ecoff Campain & Kay, Lawrence C. Ecoff and Alberto J. Campain for Defendant, Cross-defendant and Respondent Shailesh Jogani.

_____

**INTRODUCTION**

Approximately 50 years ago, brothers Haresh, Shailesh, Rajesh, and Chetan Jogani orally agreed to partner together in what would become a global diamond business. In 1995, the four brothers orally agreed to team up with a fifth brother,

Shashikant Jogani (Shashi),[1] to invest in and grow Shashi's existing real estate portfolio, thereby forming a separate real estate partnership. Haresh later denied that either partnership existed and claimed all partnership assets were his alone.

In 2003, Shashi sued his brothers and related partnership entities for his rightful share of the real estate partnership and for related damages. Rajesh and Chetan later cross-complained against their brothers and related partnership entities for their respective partnership shares in both the diamond and real estate partnerships. In 2024, following a five-month jury trial and verdicts in favor of Shashi, Rajesh, and Chetan, the court entered judgment awarding declaratory relief (including a determination of each brother's partnership shares), and compensatory and punitive damages along with prejudgment interest that totaled approximately $6.85 billion payable by Haresh and the partnership entities (hereinafter Defendants).

Defendants raise seven discrete issues on appeal, the majority of which relate to evidentiary rulings during trial. Unspecified statutory references are, thus, to the Evidence Code. Defendants argue the trial court erred in evidentiary rulings relating to Defendants' failure to produce certain records in discovery, and in admitting hearsay from third-party witnesses, hearsay in the form of Gujarati to English translations of recorded meetings between the brothers, the testimony of an attorney who formerly jointly represented Shashi and Haresh,

_____

[1] Because they share the same surname, for the sake of clarity we refer to the brothers as well as other family members by their first names. We also refer to Shashikant by the name all parties use on appeal, Shashi. No disrespect is intended.

and an opinion from Shashi's damages expert that the expert had not disclosed prior to trial. Defendants further argue the court erred in giving a special jury instruction about the statute of limitations for Rajesh's and Chetan's contract claims and in not giving a jury instruction for Defendants' affirmative defense of offset.

We conclude that Defendants have not demonstrated error except in one instance. We agree with Defendants that the court abused its discretion in not excluding testimony about an opinion from Shashi's damages expert that was not disclosed prior to trial. That opinion concerned alleged lost profits from investments that the real estate partnership sold during the 2008 housing/financial crisis. Shashi's expert testified those investments (the nature of which are unknown) would have appreciated to $1.98 billion if the partnership had continued to hold them instead of Haresh having imprudently "panicked" in 2008 and sold them at a $445 million loss. We thus conditionally affirm the judgment and order through remittitur a reduction of economic damages relating to the real estate partnership for this purported $1.98 billion in lost investment profit in amounts proportionate to Shashi, Rajesh, and Chetan's respective shares of that partnership. If any of them does not agree to the reduction, we reverse and remand for a new trial as to that individual regarding his economic damages arising out of the real estate partnership and his punitive damages. We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The long history of this case has produced a voluminous record and multiple prior writs and appeals.[2] Defendants do not challenge the sufficiency of the evidence supporting either the jury's verdict against them or the court's statement of decision on the equitable claims, and we state only the facts necessary to provide context for the appellate issues Defendants raise. We recite the facts in the manner most favorable to the judgment, and resolve all conflicts and draw all inferences in favor of the respondents. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1233, fn. 2.) Additional relevant facts are stated in the Discussion, *post*.

---

[2] See, e.g., *Jogani v. Jogani* (2006) 141 Cal.App.4th 158 (*Jogani I*); *Jogani v. Superior Court* (2008) 165 Cal.App.4th 901 (*Jogani II*); *Jogani v. Superior Court* (July 28, 2010, B224398 [nonpub. opn.]) (*Jogani III*); *Jogani v. Jogani* (Dec. 5, 2012, B222561 [nonpub. opn.]) (*Jogani IV*); *Jogani v. Jogani* (July 24, 2015, B257750) (*Jogani V*); *Jogani v. Jogani* (Oct. 25, 2016, B268162 [nonpub. opn.]) (*Jogani VI*); *Jogani v. Jogani* (Aug. 5, 2019, B285936 [nonpub. opn.]) (*Jogani VII*); *Jogani v. Jogani* (Oct. 3, 2019, B288037 [nonpub. opn.]) (*Jogani VIII*); *Jogani v. Hansa Investments Inc.* (Feb. 4, 2020, B292456 [nonpub. opn.]) (*Jogani IX*). Further, another division of this court issued *Jogani v. Jogani* (Aug. 26, 2021, B302360 [nonpub. opn.]) (*Jogani X*), an appeal from a related matter in superior court case No. BC564146. On our own motion, we take judicial notice of these prior opinions, from which we derive some of our procedural summary. (§ 452, subd. (d); *Deschene v. Pinole Point Steel Co.* (1999) 76 Cal.App.4th 33, 37, fn. 2.)

## A. The Diamond Partnership

Shashi, Shailesh, Haresh, Rajesh, and Chetan were born and raised in India.  Fulfilling their father's wish that his sons go into the diamond business together, Haresh and Shailesh created an entity called Dialust in 1972.  Rajesh and Chetan later joined.  Over time, the brothers expanded their partnership, with Haresh heading a new company in Israel and Chetan later at the helm of a business in Belgium.  Shailesh's son Pinkal, Rajesh's son Harsh, and Chetan's son Jinet eventually joined the family's business, becoming nominal owners of additional companies in the diamond partnership.  Cross-defendant Akshi Investment, Inc. (Akshi), which invested in the stock market, was also part of the brothers' partnership.

In 1990, the brothers' father passed away, and Haresh emerged as the leader of the diamond partnership.  By the early 2000s, on paper, Haresh owned 90 to 95 percent of the partnership's assets.  However, the brothers understood that all diamond partnership assets were owned as follows: Haresh, 48 percent; Shailesh, 19 percent; Rajesh, 20 percent; and Chetan, 13 percent.

Over the years, the brothers met to discuss partnership business.  Chetan, with his brothers' knowledge, recorded the meetings using his cell phone.  The brothers generally spoke Gujarati with occasional English; English language transcripts were used at trial.  The brothers' conversations were consistent with the existence of a partnership, and the recordings contain an instance of Haresh stating in English that the brothers are "partners."

Haresh would later deny a diamond partnership existed.

6

## B.    The Real Estate Partnership

Shashi chose not to be part of the diamond partnership, and in 1969, he moved to Los Angeles. In the mid-to-late 1970s, he began investing in residential apartment properties in Southern California. Within 10 years, his portfolio had a fair market value of $375 million, with equity of approximately $100 million. However, the double blow of a steep downturn in the real estate market and the 1994 Northridge earthquake caused Shashi to face financial difficulties. The earthquake damaged several of Shashi's properties, including causing a 164-unit apartment building, Northridge Meadows, to collapse. Tenants and creditors sued Shashi (see *Jogani I*, *supra*, 141 Cal.App.4th at p. 166), and the equity in his real property holdings became negative.

Shashi's attorney handling Northridge Meadows-related litigation, Seymour Fagan and the firm Tyre Kamins Katz & Granof (Tyre Kamins), advised Shashi to keep and grow his real estate holdings by partnering with an investor. Shashi spoke with several real estate investors, including Richard Julian, and with his brothers about forming such a partnership.

Written proposals between Shashi and Julian described that Shashi would place the properties he owned into a partnership, Julian would loan money to Shashi to purchase additional properties and improve and operate them, and, once Shashi had paid back the loan with interest of between 10 to 15 percent, he and Julian would be 50/50 owners. Julian testified that he had signed the proposed agreement but later learned Shashi had chosen instead to enter a deal with his brothers.

In April 1995, Haresh and Rajesh flew to Los Angeles to discuss the four brothers partnering with Shashi instead of

7

Julian. Haresh and Rajesh lacked experience in real estate investment, and Shashi, Haresh, and Rajesh discussed the potential deal for several days. On the third day, they entered into an oral agreement that mirrored the proposed partnership with Julian except that Shashi would pay 12 percent interest on the loan. Shashi asked his attorney Steven Glass to come to Shashi's house, and in Haresh's and Rajesh's presence, described the terms of their agreement to Glass. Haresh did not object to anything Shashi said.

Glass, and later, Fagan, advised Shashi to put the partnership agreement in writing. Shashi declined, believing that insisting upon a written agreement would convey a lack of trust. There was a cultural practice and family business custom not to write agreements down. Writings were created only when necessary to obtain Indian government approvals.

After the five brothers entered the real estate partnership, Haresh formed two British Virgin Islands holding entities, defendants and cross-defendants Mooreport Holdings Limited (Mooreport) and Gilu Investments Limited (Gilu). Shashi formed California-based entities, defendants and cross-defendants J.K. Properties, Inc. (JK), H.K. Realty, Inc. (HK), Commonwealth Investments, Inc. (Commonwealth), and Hansa Investments, Inc. (Hansa), and transferred title of his properties into the California entities without compensation. Because Shashi would not be a partner until he repaid the loan, Tyre Kamins drafted a consulting agreement naming Shashi as a consultant for JK to demonstrate to third parties that Shashi had authority to negotiate on the partnership's behalf.

By 2001, Shashi acquired approximately 170 apartment buildings worth about $1 billion for the partnership.

8

**C.    Events After the Formation of the Real Estate Partnership**

By 1998, many creditors had obtained judgments against Shashi.  (*Jogani I, supra*, 141 Cal.App.4th at p. 166.)  Shashi testified at debtor examinations that he had no interest in HK, JK, or in any other company Haresh owned.  (*Id*. at pp. 166-167.)  Based on advice of counsel, he understood that because he had not yet paid back the loan, he was not yet a partner in the real estate partnership.  (*Id*. at p. 167.)  Shashi also denied at the debtor examinations that he had any future or contingent interest.  (*Ibid*.)  Shashi admitted at trial this was a lie, and that Haresh had told him before the examinations, "Don't ever say that I'm your partner."

In 1999, Shashi had a heart attack.  He recovered, but the experience caused him to worry about his family's financial security.  Shashi thus focused on paying the debt he owed to his brothers so that he could acquire his real estate partnership interest.  Between 1999 and September 2001, Shashi paid the balance owed, which was $43 million in principal and $27 million in interest.

In October 2001, Shashi sought to have Haresh put Shashi's name on the titles of all the real estate partnership entities and to have the partnership distribute $4.8 million to the partners.  Haresh initially refused to permit the distribution, and tensions grew between Shashi and Haresh.  As to putting Shashi on title, Haresh delayed, stating he first wanted to understand the tax implications.

Haresh eventually distributed $2.4 million to Shashi but engaged in conduct contrary to acknowledging Shashi's 50 percent interest.  He canceled the issuance of stock to Shashi,

9

locked Shashi out of the companies, told employees they could no longer take direction from Shashi, and told Glass that he (Haresh) was the sole director of the partnership entities and the only one from whom Glass should take direction.

## D.    Shashi Files This Lawsuit

In February 2003, Shashi filed this action against his brothers, Haresh's wife, JK, HK, Commonwealth, Gilu, Mooreport, Hansa, and Hansa's nominal owner Pinkal (Shailesh's son).  Only Haresh, Pinkal, and the companies made appearances.  Shashi later filed a second amended complaint alleging causes of action for breach of contract, breach of fiduciary duty, fraud, conspiracy to commit fraud (against Pinkal only), dissolution of partnership, quantum meruit, unjust enrichment, and constructive trust.  He sought at least $250 million in damages, dissolution of the real estate partnership, an accounting, injunctive relief, institution of a constructive trust, appointment of a receiver to manage the partnership portfolio, and any other relief the court deemed proper.  (*Jogani IV*, *supra*, B222561.)

In July 2004 and February 2005, the court dismissed Chetan, Rajesh, Shailesh, and Haresh's wife from the action. (*Jogani IV*, *supra*, B222561.)  Prior to their dismissal, Chetan and Rajesh signed declarations disclaiming that there was any real estate partnership.  Years later and at trial, Chetan and Rajesh took the position that Haresh economically coerced them to sign the declarations, and that Haresh privately assured them when Shashi's case was over, everyone would get their shares. Haresh merely wanted to teach Shashi a lesson.

In 2007, the trial court granted summary adjudication against Shashi on all his causes of action except quantum meruit

10

and unjust enrichment. (*Jogani IV*, *supra*, B222561.) In later mandate proceedings we concluded Shashi's unjust enrichment and quantum meruit claims were duplicative. (*Jogani II*, *supra*, 165 Cal.App.4th at p. 911.) The matter thus proceeded to trial solely on Shashi's quantum meruit cause of action. (*Jogani IV*, *supra*, B222561.) In a posttrial appeal, we reversed the grant of summary adjudication in favor of Haresh as to Shashi's claims for breach of contract, breach of fiduciary duty, fraud, and dissolution of partnership as well as a judgment in favor of Haresh, Mooreport, and Gilu. (*Ibid*.)

### E.    Chetan and Rajesh File Cross-complaints

In 2011, Chetan, Rajesh, and Shailesh privately sought to dissolve both partnerships. Haresh asked the brothers to postpone dissolution until Shashi's lawsuit had concluded, and the brothers partially dissolved only the diamond partnership. Chetan, Rajesh, and Shailesh pooled their assets, which totaled $200 million, and distributed the assets among them. Haresh was left with certain other diamond partnership assets as well as continuing control over the investment holdings in Akshi.

In the summer of 2015, the brothers' mother told Rajesh and Chetan that she did not believe Haresh would honor the partnerships.

Spurred by their mother's concern, in October 2015, Chetan and Rajesh voluntarily submitted to the trial court's jurisdiction, answered Shashi's complaint, and filed cross-complaints against Shashi, Haresh, Shailesh, Pinkal, Akshi, and various real estate partnership entities. In September 2017, Rajesh filed a second amended cross-complaint, and Chetan a third amended cross-complaint. Those amended cross-complaints asserted claims for declaratory relief, breach of fiduciary duty, breach of contract,

11

and conversion, and sought dissolution of the real estate partnership and an accounting.  (*Jogani VII*, *supra*, B285936.)

Haresh demurred to these amended cross-complaints, arguing among other things that they were time-barred because Chetan and Rajesh had known since 2004 that Haresh denied the existence of the real estate partnership.  Pinkal joined in this argument only as to Chetan's cross-complaint.  (*Jogani VII*, *supra*, B285936.)  The trial court sustained the demurrers without leave to amend.  (*Ibid.*)  We reversed, holding that the cross-complaints were not time-barred.  We observed that nothing on the face of either cross-complaint indicated when any wrongful act occurred, and further that the cross-complaints affirmatively stated that Chetan and Rajesh only recently became aware of facts triggering the statute of limitations.  (*Ibid.*)

## F.     Shailesh Files a Complaint

In November 2014, Shailesh filed a related action against Haresh and his companies, entitled *Jogani v. Jogani*, case No. BC564146 (the Shailesh action).  (See *Jogani X*, *supra*, B302360.)  The matter was bifurcated and went before a jury only as to the issue of whether the statute of limitations had run on Shailesh's claims.  (*Ibid.*)  At trial, pursuant to section 352, the court excluded Chetan's recordings of the diamond partnership meetings and the English translated transcripts of the recordings.  (*Ibid.*)  The jury found the statute of limitations had run on Shailesh's claims.  (*Ibid.*)  Shailesh appealed, arguing the court erred in excluding the recordings and transcripts.  A different division of this court affirmed, holding, among other things, "On this record, we cannot conclude the trial court's assessment—that the probative value of the recordings was

12

outweighed by the likelihood their admission would confuse the issues or mislead the jury—was arbitrary, capricious, or patently absurd." (*Ibid*.)

## G.    Verdict, Judgment, and Post-trial Proceedings

The first phase of the trial underlying this appeal began on September 18, 2023, and concluded just over five months later, on February 26, 2024.

The jury unanimously returned a special verdict finding Shashi proved all elements of his breach of contract, breach of fiduciary duty, and intentional misrepresentation claims.  The jury found, 11-to-one, that Shashi, Chetan, Rajesh, and Haresh were partners in the real estate partnership, that the partnership beneficially owned Mooreport, Gilu, JK, HK, and Commonwealth, and that the brothers' partnership percentages were Shashi, 50 percent; Haresh, 24 percent; Rajesh, 10 percent; Chetan, 6.5 percent; and Shailesh 9.5 percent.  Also 11-to-one, the jury awarded Shashi economic damages of $1,798,846,000 and unanimously found Haresh acted with malice, oppression, and/or fraud.

The jury found, 11-to-one, in Chetan's and Rajesh's favor on their causes of action relating to the real estate partnership for breach of contract and breach of fiduciary duty, including finding that Haresh did not prove his statute of limitations defense.  It further found that Chetan and Rajesh proved their diamond partnership claims for breach of contract, breach of fiduciary duty, and conversion, and that Haresh did not prove his statute of limitations defense as to these claims.  The jury found Haresh acted with malice, oppression, and/or fraud with respect to each breach of fiduciary duty claim and conversion claim.  It also found that the diamond partnership beneficially owned Akshi.

13

The jury awarded economic damages to Chetan and Rajesh in the amount of $233,849,980 and $359,769,200, respectively, for their real estate partnership claims and $65,000,000 and $100,000,000, respectively, for their diamond partnership claims.

On March 7, 2024, the jury awarded the following brothers punitive damages: Shashi, $1,500,000,000; Chetan, $1,050,000,000; and Rajesh, $450,000,000.

Also on March 7, 2024, the trial court heard arguments on Shashi's, Chetan's, and Rajesh's declaratory relief claims and Defendants' related affirmative defenses.

On May 9, 2024, the court entered judgment against Haresh totaling approximately $6.85 billion, which included the amounts awarded by the jury as well as prejudgment interest. Defendants moved for a remittitur of damages, or in the alternative, a new trial. The court denied Defendants' motion.

Defendants requested a statement of decision regarding the declaratory relief claims and related affirmative defenses that were tried to the court. On June 28, 2024, the court issued a 50-page (without exhibits) second amended statement of decision (the statement of decision). The key dispute between the parties—whether there were oral agreements forming partnerships—depended in great part on the parties' credibility, and the court set forth in detail its credibility findings. It found, "Shashi was an extremely credible witness" who "was cross-examined for more than 26 hours," testified in "meticulous detail," and "was never contradicted." In contrast, "Haresh's denial of any partnership was simply not believable and contradicted at every turn of the evidence." The court noted Haresh's lack of knowledge about the real estate business's operation and experience in commercial real estate. Further,

14

"Haresh never offered a plausible or logical explanation as to how he was able to obtain Shashi's properties and interests in his real property without paying Shashi the reasonable value of those rights if there wasn't a partnership." It also found Haresh lacked credibility because of his "firm resistance to answering questions posed directly to him," which included "refusing to answer questions of the [c]ourt."

The court was not alone in its observations about Haresh's credibility. The court had permitted the jury to submit questions of trial witnesses. One juror submitted a question for Haresh that asked, "How come you speculated or you were not sure when answering questions that don't favor your case, yet you were absolutely positively sure when the questions did favor your case?" Another juror question submitted for Haresh asked, "If you claim you are not partners with Shashi, does that mean that the properties all belong to him since there's proof that he paid back all the millions [of dollars] with 12 percent interest?"

On October 24, 2024, the court entered a second amended judgment, which added orders concerning the issuance of shares to each of the five brothers and an award of prevailing party attorney fees and costs.

Defendants filed appeals in case Nos. B338590, B340239,[3] and B342005. We consolidated the matters under case No. B338590. Although the notices of appeal suggest Defendants intended to challenge the trial court's October 7, 2024 order granting

---

[3] Defendants observe that because they independently appealed the second amended judgment, we can dismiss appeal No. B340239, which was from an earlier version of the judgment. We accordingly do so.

attorney fees and costs, Defendants do not address the fees and costs in their briefs. Accordingly, we deem any such challenge forfeited. (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685.)

## DISCUSSION

### A. General Appellate Principles and Standard of Review

We presume an appealed judgment to be correct. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) We indulge all intendments and presumptions to support it on matters as to which the record is silent, and an appellant must affirmatively show error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

Except for two alleged instructional errors, Defendants' arguments concern the court's evidentiary rulings. We review trial court rulings as to the admissibility of evidence or the imposition of evidentiary sanctions for abuse of discretion. (*Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 878; *Poniktera v. Seiler* (2010) 181 Cal.App.4th 121, 142.) A court abuses its discretion if its ruling is " ' " ' "arbitrary, capricious, or whimsical," ' " ' " (*Ellis*, *supra*, at p. 878) " ' "where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered," ' " (*Poniktera*, *supra*, at p. 142) or " ' "when it applies the wrong legal standards applicable to the issue at hand" ' " (*Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1493).

We review instructional errors de novo. (*Collins v. Diamond Generating Corp.* (2024) 107 Cal.App.5th 1162, 1173 & fn. 5.) " 'When the contention on appeal is that the trial court failed to give a requested instruction, we review the record in the light most favorable to the party proposing the instruction to

16

determine whether it was warranted by substantial evidence.' " (*Id*. at p. 1173, fn. 5.)

We may treat as forfeited any point that the appellant does not support with reasoned argument and legal authority. (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 721.) We also may deem as forfeited arguments an appellant raises for the first time on appeal or for the first time on reply. "Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider." (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178; see also *Doe v. California Dept. of Justice* (2009) 173 Cal.App.4th 1095, 1115 [" ' "Obvious considerations of fairness . . . demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission. Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before" ' "].)

## B. We Decline to Treat Defendants' Appeal as Entirely Forfeited Due to Their Failure to Fairly State the Facts

"Rule 8.204(a)(2)(C) of the California Rules of Court imposes a duty on an appellant to '[p]rovide a summary of the significant facts limited to matters in the record.' The significant facts are not simply the facts favoring the appellant. Rather, 'An appellant must fairly set forth all the significant facts, not just those beneficial to the appellant.' " (*Perry v. Kia Motors America, Inc.* (2023) 91 Cal.App.5th 1088, 1096, italics omitted.)

Defendants' appellate briefing does not comply with this rule. It instead selectively presents those portions of the record favorable to Defendants and adverse to the judgment being appealed.

Shashi urges that we deem Defendants' appellate arguments forfeited based on their failure to provide a fair recitation of the facts in their opening brief and/or that we dismiss Defendants' appeal under the disentitlement doctrine for their multiple violations of various trial court orders. (See, e.g., *Perry v. Kia Motors America, Inc.*, *supra*, 91 Cal.App.5th at p. 1096 [failure to fairly summarize facts forfeited claim of jury instruction error]; *In re Marriage of Hofer* (2012) 208 Cal.App.4th 454, 459 [under disentitlement doctrine, appellate court may dismiss the appeal of a party who has refused to obey trial court orders].) Defendants respond that they have not challenged the sufficiency of the evidence and, thus, their partisan narrative should not result in forfeiture. They further argue the disentitlement doctrine is reserved for rare cases and inapplicable here.

We agree with Defendants that the disentitlement doctrine does not apply here, but we disfavor their failure to provide the required summary of the significant record facts. (Cal. Rules of Court, rule 8.204(a)(2)(C).) The lack of a substantial evidence challenge relieved Defendants of the requirement to set forth *all* of the material evidence. (E.g., *Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1173.) But having no obligation to summarize all the evidence did not relieve Defendants from the requirement in California Rules of Court, rule 8.204(a)(2)(C) that an appellant provide a complete summary of the facts significant to the issues they *do* raise. (*Perry v. Kia Motors America, Inc.*, *supra*, 91 Cal.App.5th at p. 1096.) This is

18

especially true here given that Defendants' claims of error regarding the admission of evidence require them to show prejudice. (E.g., *Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1449 [erroneous evidentiary rulings require reversal only if there is a reasonable probability that the jury would have reached a more favorable result in the absence of the error].) Defendants' stilted factual narrative unnecessarily burdens our analysis of any such prejudice.

Nevertheless, we exercise our discretion not to hold Defendants' appeal wholly forfeited. We instead decide the issues on the merits, except in certain instances identified below where Defendants' failure to timely raise objections or arguments deprived the court or the respondents of a fair opportunity to develop the record or respond.

## C. The Court Did Not Err in Its Evidentiary Rulings Relating to Defendants' Failure to Produce Pre-2011 Documents in Discovery

During the jury trial, the court permitted limited questioning by the attorneys about Defendants' failure to produce pre-2011 documents in discovery. Shashi sought to establish that Defendants failed to produce pre-2011 documents as required and asked the court to instruct the jury (which the court ultimately did) regarding permissible inferences the jury could draw from the willful suppression of evidence (CACI No. 204). Defendants themselves asked questions to rebut Shashi's claim that they willfully withheld documents they had been ordered to produce.

Defendants argue the trial court committed three related errors on this issue. First, they claim the court wrongly permitted the jury to decide whether two 2015 discovery orders required Defendants to produce pre-2011 documents. Second,

Defendants argue that the court's evidentiary rulings regarding the production of pre-2011 documents were so one-sided that they amounted to de facto issue and evidentiary sanctions, and that the court further sanctioned Defendants by giving CACI No. 204. Defendants lastly argue that the court abused its discretion by imposing such sanctions without first finding Defendants violated a discovery order or providing Defendants with notice and an opportunity to be heard.

As described below, the court's rulings were not one-sided nor did they impose sanctions; rather, they did not permit the parties to relitigate an already settled issue before the jury. In 2015, the trial court (Judges Rolf M. Treu and Mark V. Mooney) ordered on two separate occasions the production of certain pre-2011 documents. Later, but still years before trial, the court (Judge Mooney) reiterated that the 2015 orders required Defendants to produce pre-2011 documents. At trial, the court (Judge Susan Bryant-Deason) correctly did not reconsider these prior rulings or permit counsel to misrepresent them before the jury. As to the remainder of the challenged rulings, Defendants have not demonstrated the court abused its discretion.

1. *Additional Background*

The discovery requests at issue included Shashi's requests for the production of pre-2011 documents that referred or related to the existence of the real estate partnership, and of documents from 2011 and onwards that related to potential damages. On appeal, Defendants focus on the requests for pre-2011 documents. They do not dispute the court ordered them to produce documents from 2011 onwards, that there was substantial evidence at trial that they did not fully comply with those 2011 and onward requests, that the court properly admitted evidence of this

20

noncompliance for the jury's consideration, or that substantial evidence supported the trial court's finding in its statement of decision that "Haresh willfully refused to and failed to comply" with court orders made in 2015 "regarding discovery production." We nevertheless occasionally refer to the 2011-onwards requests to provide context to the issues before us.

### a. *Pretrial Discovery*

#### i. The Discovery Requests at Issue

In May 2014, Shashi served deposition notices with related document requests for the person most qualified (PMQ) at HK, JK, and Gilu. Defendants objected to each notice and did not produce any documents. When Shashi moved to compel, the court referred the matter to a discovery referee.

A limited number of Shashi's document requests sought pre-2011 documents, including those relating to agreements and communications between the entities and Shashi from 1994 to 2003. The remainder, 44 of the 55 requests,[4] sought information relevant to damages for the period 2011 and onward, including documents concerning the properties that made up the real estate partnership's portfolio.

The discovery dispute focused primarily on the 2011-onward requests relating to damages and not on the pre-2011 requests. Before the referee (Hon. Charles Vogel (Ret.)), Defendants claimed that they did not need to respond to the damages-related requests because Shashi was not entitled to any

---

[4] There were 56 requests in total, but one of the requests seeking 2011 and onwards documents was unnumbered. The parties' briefing collectively refers to the 55 numbered requests, and we do the same.

21

damages after his purported termination in June 2002. Shashi responded that, among other things, his damage-related requests were not overbroad because he had "narrowly tailored each request and limited each to the time period from 2011 to the present."

On January 28, 2015, the referee issued an 11-page report and recommendation (the Report). Addressing Defendants' objections, the Report stated, "There [is] nothing abusive about [Shashi]'s current discovery demands. He has limited the time from 2011 onward." The Report then referred six more times to the fact that the requests were limited to 2011 and onward. The context of those statements, however, made clear that the referee was referring to the damages requests, noting for example the 2011 and onward limitation when discussing document requests about "the current earnings and valuations of the residential apartment properties," and that Shashi was "entitled to discovery concerning the value and financial performance of the residential apartment properties owned by the partnership portfolio as of 2011 forward." The recommended order suggested the court enforce the requests as propounded, stating, "Defendants [JK], [HK], and Gilu . . . are ordered to appear for their respective depositions by a [PMQ] and to produce all of the documents requested No. 1 through No. 55 inclusive." The proposed order did not state that any of the 55 requests (which were appended as an exhibit to the Report) was limited in any manner, temporal or otherwise.

Defendants objected to the Report, which they correctly characterized as recommending that they "produce all of the documents requested by [Shashi]," which would include certain categories of documents that pre-dated 2011. Defendants argued

the recommendation depended on the relevancy of Shashi's damages after June 2002, and the referee improperly ordered that discovery. The court (Judge Treu) adopted the referee's recommended order requiring production of all requested documents and deemed the discovery order issued as of March 17, 2015 (the March 2015 order).

Defendants later moved for clarification and reconsideration of the March 2015 order. They argued for the first time that the referee had limited the 11 document requests that sought pre-2011 documents to the timeframe 2011 to present, and requested that the court issue an order clarifying that all document requests were limited to that period. Shashi objected, and moved to compel compliance with the March 2015 order, and for terminating, evidentiary, issue, and monetary sanctions.

At an October 8, 2015 hearing, the court (Judge Mooney) considered the motion for reconsideration and clarification, and denied it. The court explained it also had inherent power to act when something in prior decisions was "clearly wrong, but I can't say this is clearly wrong." As to Defendants' document production, Defendants represented to the court that the requested documents were available for Shashi to "come and get them." The court responded, "I'll just order production within 20 days, no sanctions, because you say you've got these issues why it wasn't done so far or that you made them available. . . . Just so we're clear: order granted." The court memorialized its orders on October 22, 2015 (the October 2015 order).

ii. Further Proceedings After Defendants
Made Certain Documents Available

After Defendants made documents available for copying, in May 2017, Shashi moved for sanctions and for an adverse inference jury instruction due to Defendants' failure to comply with the court's March and October 2015 orders. In support of the motion, two accountants declared they had reviewed Defendants' production and it did not include basic financial documents necessary to prove damages, such as tax returns, general ledgers, and income statements. Defendants represented there were more documents for Shashi to copy, and the court continued Shashi's motion.

Defendants produced more boxes of documents that were, according to Shashi, nonresponsive. Defendants argued they did not maintain some of the records Shashi had requested in the normal course of business, including entity level (i.e., HK's and JK's) financial statements. On June 6, 2017, the court ordered Defendants to make available a PMQ about how the entities generated and kept documents.

Defendants identified Ritesh Desai, the then vice-president of HK and JK, as the PMQ. At deposition, Desai testified he had never been tasked with producing any pre-2011 documents. He further testified that entity-level annual financial statements were created for tax purposes every year but were overwritten with the following year's data.

After Desai's deposition, Defendants filed a declaration from Desai in opposition to the pending sanctions motion stating that "in re-reviewing the March 17, 2015 [o]rder, [his] memory was refreshed that a small number of the requests toward the end of the list may pertain to a time . . . before 2011 . . . . In so

24

doing, [his] memory also was refreshed that *any such pre-2011 responsive documents were provided to [Shashi] . . . .* Any suggestion that the PM[Q] [d]eponents arbitrarily refused to produce documents *before 2011* or otherwise ignored the [c]ourt's orders is false." (Italics added.)

On July 11, 2017, Judge Mooney heard Shashi's motion for sanctions. Shashi argued Desai admitted in deposition that Defendants did not look for pre-2011 materials. Defendants argued that prior discovery orders limited production to documents created after 2011. They further argued, in accord with Desai's post-deposition declaration, that in any event Shashi's "argument that we produced no . . . documents from [19]95 to 2002 is patently absurd" and that the documents "were produced long ago in 2004."

The court did not agree that previous orders had limited all discovery requests to 2011 onwards. It stated it could not tell from the record before it whether Defendants had produced the pre-2011 material requested: "[Defendants] say it's all there, [Shashi] say[s] it's not. I can't tell." The court stated that without itself personally going through the voluminous documents, it could not make a finding one way or the other concerning compliance. Thus, the court left the issue of whether it would impose sanctions until after it saw the evidence presented at trial as to whether Defendants had in fact withheld or spoliated evidence. (*Jogani VII, supra*, B285936.)

b.    *Defendants' Motion in Limine*

In March 2022, Defendants moved in limine to "exclude any reference at trial, without a proffer of evidence outside the presence of the jury, that . . . Defendants have altered or withheld any records." The motion was based upon Shashi's

"unsubstantiated accusations" that Defendants had delayed producing discovery to create false records. In opposition, Shashi observed Defendants' basis for the motion did not support excluding evidence that Defendants *withheld* documents relating to the existence of a partnership or damages. The court granted the motion but stated, "What is excluded is any documents that were altered or destroyed."

  c. *Trial*

   i. <u>Opening Statement</u>

During opening statement, Shashi's counsel told the jury that Defendants would emphasize the lack of documentation reflecting the brothers' real estate partnership. Shashi explained that Defendants had been ordered twice to produce such documents and failed to look for them. The court (Judge Bryant-Deason) overruled Defendants' objections to these statements.

Outside the presence of the jury, Defendants argued Shashi's opening statement violated the in limine ruling. Shashi argued that Judge Mooney had left for the jury to decide whether Defendants failed to produce requested documents and that the in limine ruling did not preclude evidence that Defendants withheld documents. The court agreed, finding it probative evidence that Defendants withheld documents they were ordered to produce. Defendants moved for mistrial, and the court denied the motion.

   ii. <u>Shashi's Testimony</u>

Shashi testified that in 2002, he was locked out of the office and could not access documents. During his testimony but outside the presence of the jury, the parties debated whether Shashi could move the two 2015 discovery orders into evidence. Shashi proposed that the court admit the orders but redact the

referee's analysis of Defendants' objections. The court denied the request, saying, "None of that is coming in." Defendants argued whether they failed to comply with the 2015 orders was for the court and not the jury to decide, but acknowledged Shashi could question Desai, who Defendants characterized as "the document custodian who appeared as the PM[Q] on this very issue," about what Defendants had produced. During the parties' arguments, Shashi stated the court had repeatedly ordered the production of pre-2011 documents; Defendants did not disagree with this statement. The court then described the questions it would permit of Shashi on this issue, which included, "Did a court order . . . them to give you those papers? Yes, it did. Did they give them? No. . . . Was it ordered by a court? Yes, it was." It further stated that it would overrule objections to such questions. As for the 2015 orders themselves, the court repeated that it would not mark them as exhibits.

Shashi then testified before the jury that he asked Defendants to provide certain documents during the litigation and a judge ordered Defendants to produce them, but Defendants did not do so. Shashi had to return to court to get a second order. Defendants then produced "garbage." Shashi, his staff, and independent accountants went through the documents Defendants provided and did not find the financial documents required under the 2015 orders. During Shashi's cross-examination, Defendants attempted to ask Shashi about the court imposing monetary sanctions on him. The court sustained Shashi's objection to the question.

### iii.    Desai's Testimony

Three weeks later, Shashi was scheduled to call Desai to testify pursuant to section 776. Defendants objected to Desai

being asked about the 2015 orders before the jury. They argued for the first time in connection with the trial that the 2015 orders had limited discovery to 2011 and onward. The court interrupted Shashi's counsel's response and directed him, "Why don't you just go to page 10 under 'recommended order,'" where it stated that Defendants "'are ordered . . . to produce *all* of the documents requested in No. 1 to No. 55, inclusive.'" (Italics added.) The court indicated that order remained operative as it had read the prior orders by Judges Treu and Mooney as well as the referee's Report and proposed order. The court stated that Shashi could question Desai within the same parameters of what Desai was asked during deposition on this topic.

Prior to Desai taking the stand later that day, one of Defendants' attorneys explained he had not been present during the court's ruling earlier that day concerning the 2015 orders. Counsel stated, "There's just one aspect that I think was mistaken, and that is the notion that the order from 2015 required documents to be produced before 2011." Following argument, the court stated, "My ruling stands." The court also indicated, "[W]e're not going to mark the order. The order is not coming into evidence. [Counsel are] not going to ask a question about it." Defendants sought clarification whether Shashi could ask questions "implying" there was an order requiring production of pre-2011 documents. The court responded that Shashi's counsel could ask such questions.

Desai testified that he was the president of JK and HK and the PMQ regarding their document production. Without publishing any court order to the jury, Shashi's counsel directed Desai to look at a particular portion of the discovery order and asked about the time range stated in the requests. Defendants

objected to the question as inconsistent with the court's ruling; the court overruled the objection, noting, "This is not inconsistent." Desai acknowledged that he had previously testified that he did not look for any pre-2011 documents, and that Anil Mehta, who reported directly to Haresh, instructed Desai to provide documents from 2011 onwards. Shashi's counsel asked, "So despite the fact that the order required you to look for documents from 1994 to 2003[,] . . . Mehta told you only look for documents . . . from 2011 forward; right?" Defendants objected that the question "misstate[d] the order." The court overruled the objection, and Desai responded, "Yes. We were instructed . . . to provide the documents from 2011 onwards." Shashi's counsel asked whether that instruction came from Mehta or the court. Defendants again objected that the question "misstate[d] the direction of the court." The court overruled the objection. Desai testified that the instructions came from Mehta.

On cross-examination, Desai testified, "We complied with the order of documents we were told to provide," making 500 to 600 banker's boxes of documents available for copying, "which includes everything that was mentioned in the court order." "Everything was provided," and nothing was destroyed. He testified that he recalled the court orders stated the document production was to be for documents created in 2011 and after. Shashi did not object to Desai's recollection, but did object to Defendants' questions that sought to have Desai identify the limiting language in the court order. The court sustained the objections.

On re-direct, Shashi asked Desai if he understood the order did not require Defendants to produce pre-2011 documents. Desai responded, "Yes. I do recall 2011 onwards documents to be

29

provided." Desai understood certain requests originally asked for documents created prior to 2011, but he did not know what transpired "in between from the attorney side," and was instructed by Mehta to produce only documents from 2011 onward. Shashi then attempted to have Desai look at the document requests. The court stopped him from doing so, stating, "I don't want you to get into it." Shashi's counsel then read from (but did not seek to admit) the portion of Desai's 2017 declaration where he acknowledged that a small number of requests sought pre-2011 documents. Shashi asked, "When the court ordered you to produce documents reflecting any agreement between Shashi and [HK] or [JK] or Gilu between [19]94 and 2003, you didn't even look for them; right?" Defendants objected that the question "misstate[d] the order." The court responded it did not and overruled the objection. The court then asked Desai whether, in 2017, after he signed the declaration, "Did you look for [the documents] when you realized that you had misread it? Did you look for them?" Defendants' counsel objected that the court had mischaracterized Desai's declaration. The court overruled the objection and repeated its question. Desai stated he did not recall and reiterated, "I don't know what happened with the court order in between from the attorney side."

Desai returned to the stand the next day and testified that he had reviewed the March 2015 order and his deposition testimony overnight. Defendants sought to publish before the jury a portion of Desai's 2017 declaration. Shashi objected that the declaration was hearsay. Defendants argued it was a prior consistent statement and necessary to provide the complete context of the declaration. Shashi argued, "If counsel wants to ask about what [Desai's] understanding was in 2017, . . . that I

don't have a problem with. Reading it into the record I do object to." The court sustained the objection.

Defendants then asked Desai to focus on the period after his deposition and to describe Defendants' document production. Desai responded that the court order stated 2011 onwards in various places, so it was "very clear" that the order was to produce documents from 2011 onwards.

Shashi asked if Defendants would stipulate to moving the 2015 discovery orders into evidence. The court responded that regardless of whether defense counsel "stipulates or not, you're not going to move it in." Shashi again attempted to ask Desai about the document requests appended to the March 2015 order. The court did not allow the question, stating, "I've already ruled" and ordering Shashi to "move on." Shashi then asked, "You understood in 2017 that, in order for Shashi to prove his case, he wanted documents from [19]94 to 2003 that [HK] and [JK] had; right?" Desai responded affirmatively and then added, "that was already provided."

After Desai's testimony, Defendants moved for a mistrial. They argued Shashi was permitted to examine Desai as to the 2015 orders, but Defendants were not. Defendants also complained that the court prevented them from asking about Shashi's own discovery violations, and that the court allowed Shashi to impeach Desai with a sentence in his declaration without the surrounding context which mischaracterized the declaration. The court denied the motion.

### iv. Jeet Jogani's Testimony

In their case, Defendants did not recall Desai but called instead Haresh's son and HK's and JK's then-corporate secretary, Jeet Jogani. The court sustained objections to questions put to

31

Jeet about documents kept by the companies because Defendants had not shown Jeet was a qualified custodian of records (among other things, Jeet was 11 years old when some of the documents were created). In line with its repeated sustaining of objections based on lack of foundation, the court also sustained objections to questions of Jeet about HK and JK's document production.

### v. Jury Instruction Conference

When the parties and court discussed jury instructions, Shashi requested CACI No. 204, which states, "Willful Suppression of Evidence[.] You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party." Defendants argued they had not been given an opportunity during trial to present evidence that the documents were produced, asserting that Jeet was Defendants' "key" witness on the issue. Shashi argued that Defendants identified Desai, not Jeet, as the PMQ on the issue. The court ruled that it would give the instruction.

The court also agreed to give CACI No. 203, which states, "You may consider the ability of each party to provide evidence. If a party provided weaker evidence when it could have provided stronger evidence, you may distrust the weaker evidence."

### vi. Closing Arguments

As part of his closing argument, Shashi argued he requested documents from Defendants to meet his burden of proof at trial. Defendants were ordered to produce documents but did not. Thus, if Shashi did not have enough documentary evidence to support his claims, it was not his fault.

During Defendants' closing argument, they emphasized that the documentary evidence, including documents reflecting

32

the corporate ownership structure, government records, the brothers' declarations, the consulting agreement, and other contemporaneous documents, demonstrated that Haresh was the sole owner of the companies and properties.  They also emphasized the American tradition of putting real estate transactions in writing, and asserted that because the supposed partnership owned properties in California, the absence of documentary evidence that there was a real estate partnership between the brothers was telling.

Defendants largely pursued this theme without objection, stating, for example, "There's absolutely no mention anywhere that Shashi had an interest or any of the other brothers did either.  There's nothing in any of the corporate documents that even hints it."  "There's no memo.  There's no side letter.  There's no yellow sticky tab.  There's nothing."  Instead, the brothers' declarations disclaimed any partnership.  "We didn't see . . . documentation anywhere during this trial reflecting a supposed five-brother real estate partnership."  "They act like putting real estate transactions on paper is some kind of an odd, weird, unnecessary exercise in America. . . .  Every witness who has testified about how you conduct American real estate business . . . has confirmed that it's all done in writing.  In our case, think about the abundance of paperwork[] [p]roving Haresh owns 100 percent of these properties."

Defendants then stated, "Now think about on the other side of this case, the lack of paperwork supporting the position that Shashi and his three brothers somehow own 76 percent, and they're only going to leave Haresh with the 24 percent."  Shashi objected, stating, "This involved the documents which were ordered and not produced."  The court responded, "I said let's stay

away from that if we can." Defendants continued to emphasize that the existence of the partnership was unbelievable as it would have been easy to document it, but the brothers did not do so. Defendants later referred to indirect evidence the jury might expect to see if there was a real estate partnership, such as partnership books and records. Shashi objected that the argument went to the documents that were ordered and not produced. The court responded, "Let's stay away from that if we can, please."

In his rebuttal closing argument, Shashi referred to Desai's testimony concerning Defendants' document production. Defendants objected, noting that when they tried to discuss the issue, the court stopped them. The court responded that it did not recall that, and Shashi thereafter read several pages of Desai's trial testimony about the document production to the jury. Shashi described CACI Nos. 203 and 204, and posited that Haresh did not produce documents in order to "have [his] lawyer stand up [later at trial] and say, 'You see? I only do it in writing. There's no writing.'"

Defendants moved for mistrial based on the court limiting their closing argument about the absence of documentary evidence of the partnership. The court denied the motion.

2.    *Analysis*

Defendants argue (1) the 2015 discovery orders did not require them to produce any pre-2011 documents, (2) the court improperly left the interpretation of the orders up to the jury, and (3) the court made one-sided evidentiary rulings that were tantamount to evidentiary and issue sanctions.

34

a. *The 2015 Orders Required the Production of Pre-2011 Documents*

We begin by noting that Defendants' assertion the discovery orders did not require them to produce pre-2011 documents is simply wrong. The March 2015 order stated that Defendants were "to produce all of the documents requested No. 1 through No. 55 inclusive" without any limitation, meaning those requests that called for pre-2011 documents were not limited to some lesser time period. Although isolated snippets of the referee's Report and Shashi's submission to the referee described the requests as limited to 2011 and after, in context these statements refer to the 44 out of 55 requests relating to damages which as originally written were limited to 2011 and after. Shashi's statement that his requests were limited to 2011 and onward was not a concession that he would so limit all 55 requests; it was a response to Defendants' argument that the court should not order the production of damages-related discovery on 44 of the 55 requests. In any event, Shashi's statements during litigation of the motion to compel were not a court order, nor incorporated into that order and, thus, do not govern.

Multiple judicial officers presided over the long course of this matter, and none of them agreed with Defendants that the orders compelling production were limited to post-2011 documents. Judge Treu's original order contained no such limitation. In October 2015, Judge Mooney denied Defendants' motion to interpret the March 2015 order as limited to documents created in 2011 and after, and again ordered Defendants to comply with the March order compelling production. Thus, the directive "to produce all of the documents requested No. 1

35

through No. 55 inclusive" remained, which included pre-2011 documents. When Judge Mooney revisited the issue two years later as part of Shashi's motion for terminating sanctions, the court impliedly found Defendants had been ordered to produce pre-2011 documents, noting Defendants claimed they had produced all such material, Shashi said they had not, and that because the court could not yet tell who was being truthful about the production of pre-2011 documents, it would wait to review the evidence presented at trial before coming to a final decision on sanctions.

b.  *The Trial Court Did Not Leave the Interpretation of the Order to the Jury*

At trial, the court (Judge Bryant-Deason) consistently conveyed her understanding that the 2015 discovery orders included pre-2011 documents. Before Desai's testimony, the court rejected an argument from Defendants that the 2015 orders did not require pre-2011 documents to be produced. When Defendants' counsel objected four times to Shashi's counsel's characterization of the March 2015 order as requiring pre-2011 documents as "misstat[ing]" the order, the court overruled all four objections.[5]

Thus, the record does not support Defendants' argument that the court left the interpretation of the discovery orders up to

---

[5] The court's later statement of decision reiterated the same, explaining, "The documents which were twice ordered to be produced related directly to the existence of the partnership between Shashi, Rajesh, Chetan, Shailesh, and Haresh, . . . and the six[-]and-a-half[-]year course of dealings between April 1995 and September 2001."

the jury or their concomitant argument that the court unfairly prevented Defendants from litigating whether the 2015 orders required Defendants to produce pre-2011 documents. The court already determined the issue before trial ever began; during trial the court only prevented *re*-litigating an already decided issue and mischaracterizing the 2015 orders before the jury, both of which were entirely permissible. The only question for the jury was sorting out whether Defendants had produced such documents in their possession, and if it concluded Defendants intentionally had not, determining what inferences if any to draw from that fact. Those questions were appropriate for the jury to consider.

c. *The Court's Evidentiary Rulings Were Not an Abuse of Discretion*

The court's evidentiary rulings were not unfairly one-sided and did not amount to de facto evidentiary or issue sanctions. Rather, those rulings did not permit the parties to re-litigate what the court orders required and ensured a proper focus on the testimony and evidence relevant to the jury's application of CACI Nos. 203 and 204. Those issues included whether Defendants failed to produce pre-2011 documents, whether that failure was willful, and what impact, if any, Defendants' failure had on Shashi's ability to prove the existence of the real estate partnership.

Shashi was properly permitted to elicit testimony that the 2015 orders required Defendants to produce pre-2011 documents and that despite such orders, what they produced did not include those documents, establishing a prima facie showing of willful suppression and explaining why Shashi did not have stronger evidence to prove the partnership. However, the court also

37

prohibited Shashi from going further into the 2015 orders or showing them to the jury. The court did not permit Defendants to attempt mischaracterizing the orders as saying something other than what they did, but permitted Desai to testify that he understood Defendants did not have an obligation to produce such documents, leaving open the possibility that Defendants' noncompliance with the orders were a result of a misunderstanding or inadvertence and not willful disobedience.

Additionally, the court's decision to preclude Jeet from testifying about Defendants' document production was not arbitrary or capricious. Although Defendants contend Jeet was a "key" witness as to their document production, they had identified Desai—not Jeet—as the PMQ for their document production. Jeet did not meet the qualifications for a custodian of records and lacked foundation to testify as to the questions put to him. Even if we assume Defendants had shown some type of error with regard to the objections made to questions posed to Jeet, they make no offer of proof of what Jeet would have said about the document production that was not already in evidence. (*Gutierrez v. Cassiar Min. Corp.* (1998) 64 Cal.App.4th 148, 161 ["Assuming error might be shown, [the appellant]'s failure to make an offer of proof or other proper record of [a witness]'s testimony defeats the claim"].)

Defendants also argue that the court unfairly precluded testimony that Shashi was ordered to pay monetary sanctions for discovery violations. However, Defendants never argued that the conduct for which Shashi was sanctioned impacted their ability to present evidence at trial. Thus, the imposition of sanctions on Shashi was not relevant to any question to be decided by the jury.

38

Defendants have not demonstrated that excluding such evidence was an abuse of discretion.

Defendants take issue with the court's questions to Desai asking if Defendants produced documents once Desai realized he was mistaken in his understanding of the 2015 orders. Defendants argue the court's questions "mischaracteriz[ed] Desai's prior testimony." However, Desai admitted in his declaration that when he reviewed the order after his deposition "[his] memory was refreshed that a small number of the requests toward the end of the list may pertain to the time period that extends before 2011." Thus, the court's characterization of Desai's declaration was correct. Further, the question was a fair one as it was probative of whether Defendants' conduct was willful. Nor did the court prohibit Defendants from asking questions of Desai to elicit testimony that Defendants did, in fact, produce the pre-2011 materials. At trial, however, Desai chose to answer by stating (contrary to his prior declaration) that his understanding was that the 2015 orders did not require the production of pre-2011 documents.

Defendants argue the court's purportedly one-sided rulings continued during closing argument when the court permitted Shashi to speak to the jury about Defendants' failure to produce documents but stopped Defendants from going into the lack of paperwork supporting Shashi's position. The court did not prevent Defendants from making this point; it instead told them not to dwell on aspects of that argument that implicated the 2015 discovery orders. Considering the substance and tenor of Defendants' closing argument as a whole, it is impossible to believe that the jury did not understand Defendants' main point that there were no writings evidencing the partnership and that

this showed the supposed partnership did not exist.  Thus, even if we assume the court's rulings in this regard to have been arbitrary, they were not prejudicial.

Finally, we reject Defendants' argument that the permissive adverse inference instruction, CACI No. 204, was a sanction that required the court to first find a discovery order violation.  Rather, "[s]uch an instruction is appropriate if there is evidence of willful suppression." (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1434.)  As described above, the record before us contains ample such evidence.

## D.  **Defendants Have Not Shown Prejudicial Error From the Statute of Limitations Jury Instruction**

Defendants argue that the trial court erred in giving a special jury instruction on the statute of limitations for Rajesh's and Chetan's contract claims derived from *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479 (the *Romano* instruction).  However, the jury awarded the same damages for Rajesh's and Chetan's breach of fiduciary duty claims as it did for their contract claims, and the statute of limitations instruction for their breach of fiduciary duty claim was not erroneous.  Defendants' challenge to the *Romano* instruction is therefore moot.

### 1.  *Additional Background*

#### a.  Jogani VIII *Opinion*

As explained *ante*, Rajesh and Chetan filed amended cross-complaints in 2017 that included breach of contract claims.  (See *ante*, Background, subsection E.)  In a prior appeal, we reversed the trial court's sustaining of a demurrer to those claims as being untimely.  (*Jogani VIII*, *supra*, B288037.)

40

Our opinion in *Jogani VIII* stated the following based on *Romano v. Rockwell Internat., Inc., supra*, 14 Cal.4th 479 as to the contract claims:  "For the purpose of determining when the period of limitations begins to run, a plaintiff may elect to rely on a contractual agreement despite a breach, 'and the statute of limitations does not begin to run until the plaintiff has elected to treat the breach as terminating the contract.  [Citation.]  In the context of successive breaches of a continuing contractual obligation, [our Supreme Court] ha[s] explained:  " 'In such a contract . . . the injured party could wait until the time arrived for a complete performance by the other party and then bring an action for damages for such breaches.' " '  (*Romano, supra*, . . . at pp. 489-490.)  A nonbreaching party, such as Rajesh or Chetan, is 'not bound to treat the contract as abandoned on the first breach of it, or on any particular breach,' but may elect still to rely on it, and the limitations period does not begin to run until the nonbreaching party makes its election.  (*Id*. at p. 490.)"  (*Jogani VIII, supra*, B288037.)

b.    *Trial*

At trial, Defendants argued the statute of limitations barred Rajesh's and Chetan's breach of contract, breach of fiduciary duty, and conversion claims.  Rajesh and Chetan testified that although Haresh denied the existence of the real estate partnership publicly and to Shashi, Haresh repeatedly assured Rajesh and Chetan that they were partners and that Haresh simply wanted to teach Shashi a lesson.  Haresh told Rajesh and Chetan that once Shashi's lawsuit concluded, he would distribute to everyone their rightful shares.  Rajesh and Chetan testified that it was not until the summer of 2015 when their mother told them that she did not believe Haresh would

41

remain true to his word that they suspected that Haresh would not honor the partnership.

Over Defendants' objection, the trial court gave the following special jury instruction, the italicized portion of which was the *Romano* instruction:

"Haresh contends that Chetan and Rajesh's cross-complaints weren't filed within the time set by law. To succeed on this defense, Haresh must prove that Chetan and Rajesh's claimed harm occurred before October 30th, 2013, for breach of contract, before October 30th, 2011,[6] for breach of fiduciary duty, and before October 30th, 2012, for conversion.

"If Haresh proves that Chetan or Rajesh's claimed harm occurred before October 30th, 2013, for breach of contract, October 30th, 2011, for breach of fiduciary duty[,] or before October 30, 2012, for conversion, Chetan and Rajesh's . . . lawsuit was still filed on time if Chetan and Rajesh prove that before those dates, Chetan and Rajesh did not discover and did not know of facts that would have caused a reasonable person to suspect that they had suffered harm that was caused by someone's wrongful conduct.

"*For purposes of determining when the period of limitations begins to run, an injured party to a contract may elect to rely on a contractual agreement despite a breach and the statute of*

---

[6] Breach of fiduciary duty is generally governed by the residual four-year statute of limitations in Code of Civil Procedure section 343, but the limitations period may vary depending on the gravamen of the claim. (*Thomson v. Canyon* (2011) 198 Cal.App.4th 594, 606-607.) At trial, Haresh argued that the statute of limitations should have been set to three years, but he does not pursue this argument on appeal.

*limitations does not begin to run until the injured party has elected to treat the breach as terminating the contract.*

*"Where there are successive breaches of a continuing contractual . . . obligation, an injured party can wait until the time arrived for a complete performance by the other party and then bring an action for damages for such breaches.*

*"An injured party is not bound to treat the contract as abandoned on the first breach of it, or on any particular breach, but may elect still to rely on it and the limitations period does not begin to run until the injured party makes its election to terminate the contract.*

"Where . . . a fiduciary obligation is present, the statute of limitations does not start to run until the injured party has knowledge or notice of the act consisting of a breach of fiduciary duty.

"The existence of a fiduciary relationship limits the duty of inquiry, thus when an injured party is in a fiduciary relationship with another individual, the injured party's burden of discovery is reduced, and he is entitled to rely on the statements and advice provided by the fiduciary.

"*As to the statute of limitations, Rajesh and Chetan had a duty to investigate, even where a fiduciary duty exists, when he has notice of facts sufficient to arouse suspicions of a reasonable person.*"  (Italics added.)

During closing argument, Defendants emphasized that this special instruction set forth "three different time periods.  There's three different kinds of claims. . . .  [E]ach of the claims has a little different statute of limitations duration."

The jury answered five separate questions on the special verdict form, finding that Haresh did not prove his statute of

43

limitations defense as to the claims for (1) breach of the real estate partnership agreement, (2) breach of the diamond partnership agreement, (3) breach of fiduciary duty as to the real estate partnership, (4) breach of fiduciary duty as to the diamond partnership, and (5) conversion as to the diamond partnership. The jury found that Rajesh's and Chetan's damages for each claim relating to the real estate partnership were $359,769,200 and $233,849,980, respectively. It also identified $359,769,200 and $233,849,980 as the total damages for the real estate partnership claims, meaning the amount of damages identified for each claim was duplicative of the others. Similarly, the jury found Rajesh's and Chetan's damages for each claim relating to the diamond partnership were $100 million and $65 million, respectively, and that the total damages for the diamond partnership claims were those same amounts.

2.  *Analysis*

Defendants argue that the *Romano* instruction was inapplicable to the type of contractual breaches here. They further argue that the instruction "likely confused the jury about how to calculate the statute of limitations for Rajesh and Chetan's fiduciary[ ]duty and conversion claims" because the court "lumped the three claims together." Rajesh and Chetan counter that even if the court erred in giving the *Romano* instruction, there was no miscarriage of justice because they would be awarded the same damages even if the breach of contract claim failed—in other words, that there was no spillover confusion from the *Romano* instruction's explanation of the breach of contract statute of limitations to the breach of fiduciary duty and conversion claims.

44

We agree with Rajesh and Chetan. Even if we assume solely for the sake of argument that the court erred in giving the *Romano* instruction, appellate courts do not engage in idle acts. (See Civ. Code, § 3532; *VTN Consolidated, Inc. v. Northbrook Ins. Co.* (1979) 92 Cal.App.3d 888, 893.) We may not reverse a judgment for instructional error in a civil case "unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574, 580, citing *People v. Watson* (1956) 46 Cal.2d 818.)

Here, the jury awarded the same amount in damages for each of the real estate partnership claims and for each of the diamond partnership claims. Thus, reversal based on instructional error as to the breach of contract claims would be futile if the breach of fiduciary duty (diamond partnership) and breach of fiduciary duty (real estate partnership) claims survive Defendants' appellate challenge. They do.

Defendants do not argue that the breach of fiduciary duty statute of limitations instruction itself was flawed. Nor do they argue that if the jury faithfully applied this instruction, the evidence compelled the jury to find that the breach of fiduciary duty claims were time-barred as a matter of law.[7] Rather, they

---

[7] The statute of limitations is an affirmative defense and it was Defendants' burden to prove each element of the defense. (*Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 945.) "Under th[e substantial evidence] standard, 'when the trier of fact has . . . concluded the party with the burden of proof did not carry the burden and that party appeals, . . . " 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' " ' "

45

assert that the *Romano* instruction "likely" confused the jury as to the correct standard for the tort claims.  Defendants' basis for this argument is that the court "lumped" the three claims (breach of contract, breach of fiduciary duty, and conversion) together, the court provided no separate instruction on the statute of limitations for conversion, and neither the verdict forms nor cross-complainants' closing argument sufficiently emphasized differences between the claims.

"In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given.  [Citation.]  ' "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." ' [Citation.]  'The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.' " (*People v. Barber* (2020) 55 Cal.App.5th 787, 798-799.)

The first portion of the special instruction (as well as Defendants' closing argument) explained that there were three different types of claims and three different statute of limitations time periods for the jury to consider.  The instruction's use of the words "contract" and "fiduciary" in separate portions of the instruction also cued the jury as to which standard applied to which type of claim.  In light of this language and that it is the Defendants' burden to show some type of "spillover" impact,

(*Garcia v. KND Development 52, LLC* (2020) 58 Cal.App.5th 736, 744.)

46

Defendants' speculation that the jury may have been confused fails.[8]

Defendants thus have not demonstrated any instructional error impacting Rajesh and Chetan's breach of fiduciary duty claims. Because the jury's damage award for such claims is coextensive with the damage award for Rajesh and Chetan's breach of contract claims, there is no prejudice to Defendants even assuming the *Romano* instruction was erroneous.

## E. Defendants Have Not Shown the Court Prejudicially Erred in Admitting Prior Consistent Statements

Defendants argue that the court should have excluded as hearsay the testimony of third-party witnesses who stated that Shashi told them, prior to any dispute arising over the real estate partnership's existence, that Shashi and his brothers had entered such a partnership. Shashi argues the testimony was admissible as prior consistent statements under sections 791 and 1236.

---

[8] In their reply brief, Defendants argue that the jury's finding that they breached their fiduciary duties to Chetan and Rajesh depended on the jury first finding that there was a breach of contract because the claims were predicated on the same conduct. We deem this argument forfeited as it was raised for the first time in reply. (*Doe v. California Dept. of Justice, supra,* 173 Cal.App.4th at p. 1115.) Even if it was not forfeited, the argument fails. That the same general conduct may support both claims does not necessarily mean the jury found identical conduct supported both breaches. Further, the portion of the special instruction relating to fiduciary duty claims says nothing about successive breaches, which is the core of Defendants' complaint about the *Romano* instruction.

1.   *Additional Background*

Shashi's case centered on the claim that he had an oral partnership agreement with his brothers. During opening statements, Shashi's counsel told the jury they would hear Shashi testify about the real estate partnership and the brothers' respective shares in it. Defendants' counsel told the jury in their opening statement, "It's pretty clear Shashi is going to get in that witness chair when it's his turn and he's going to look at all of you and say that he's a partner, in an oral partnership with Haresh that owns these real estate companies." Defendants then detailed evidence the jury would see that contradicted Shashi's claim, including a declaration from Shashi in which he stated he had no interest in the partnership entities.

Prior to Shashi taking the stand, approximately 10 third-party witnesses testified that Shashi had told them that he and his brothers had entered into an agreement or partnership before the date when Haresh began to deny the partnership's existence.[9]

---

[9] Defendants cite the following testimony: Allen Boerner (owner of a real estate company) testified that "Shashi came to me and said he decided to do the deal with his brother . . . 50/50." Dash Chopra (a commercial real estate broker) testified that Shashi told him Shashi "was in a partnership" with his brother, "was being charged interest," and had to pay a "preferred return to Haresh." Chandrakant Shah (Shashi's friend) testified that, "[i]n 1995, Shashi told me that [he] had a partnership with the other brothers." Fagan testified that Shashi said, "he and his brother had made an agreement" where "all of the properties" would be "owned by Haresh," but Shashi would "manage and run those properties," and "find other properties" to buy. Glass said

48

2. *There Was No Error in Admitting the Statements Before Shashi Testified*

Section 1236 states, "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with [s]ection 791." Section 791 states in pertinent part, "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] . . . [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Defendants argue section 791, subdivision (b) (section 791(b)) required two events to occur at trial before any third-party witness could testify as to what Shashi told them:

---

that Shashi told him he "reached an agreement with [his] brother Haresh and the other brothers," "that Haresh was going to put up the money and that [Shashi] would have full management control of the properties," and there was a "preferred" interest rate. Prakash Patel (Shashi's friend) testified that Shashi "said he was in partnership with his brother, 50/50," and that after Haresh's "principal interest [was] paid," Shashi would "be 50 percent partner and his brothers will be 50 percent partners." Dinesh Shah (former president of HK and JK) stated that Shashi twice told him that "it was a partnership" and that "the interest would be 12 percent." Julian and Bhupesh Parikh testified similarly. Defendants also cite to the testimony of Ashwin Sheth, Stuart Hurwitz, and Dinker Shah but made no hearsay objection to the cited testimony and, thus, forfeited their challenge thereto.

49

(1) Shashi had to testify, and (2) Defendants thereafter had to present evidence attacking Shashi's credibility or implying his trial testimony was fabricated or influenced by improper motive. They contend the trial court thus abused its discretion by admitting testimony about Shashi's prior consistent statements before Shashi himself testified and was impeached.

The plain language of section 791 contemplates a broader application than Defendants allow. Taking Defendants' second point first, section 791(b) did not require that Defendants present "evidence" that Shashi's testimony was fabricated or influenced by improper motive before the prior consistent statements at issue could be admitted. Section 791(b) requires only that there first be a "charge" of fabrication or influence by improper motive. If the Legislature intended to require *evidence* before the admission of the prior consistent statement, it would have said so, as it did in section 791, subdivision (a), which provides an alternate ground not applicable here for the admission of prior consistent statements.[10] (*People v. Harper* (2003) 109 Cal.App.4th 520, 524 ["The Legislature's choice of words is usually the best indicator of its intent"].) Thus, Defendants' overarching theme accusing Shashi of fabricating the existence of the real estate partnership, which was raised as soon as trial

---

[10] That subdivision states, "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) *Evidence* of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement . . . ." (§ 791, subd. (a), italics added.)

began in Defendants' opening statement, was a "charge" within the meaning of section 791(b).

Turning to whether Shashi had to testify before his prior consistent statements could be admitted, section 791(b) along with section 1236 require a declarant to testify at some point during the hearing. The United States Supreme Court explained the rationale for this requirement: "[T]he usual dangers of hearsay are largely nonexistent where the witness testifies at trial. 'The whole purpose of the [h]earsay rule has been already satisfied [because] the witness is present and subject to cross-examination [and t]here is ample opportunity to test him as to the basis for his former statement.'" (*California v. Green* (1970) 399 U.S. 149, 155, fn. omitted [90 S.Ct. 1930, 26 L.Ed.2d 489] [evaluating the constitutionality of § 1235, which permits the admission of prior inconsistent statements for their truth]; see also *Tome v. United States* (1995) 513 U.S. 150, 157 [155 S.Ct. 696, 130 L.Ed.2d 574] [explaining that prior consistent statements under the Federal Rules of Evidence are nonhearsay because the declarant is present in court and subject to cross-examination].) However, neither the express language of sections 791(b) or 1236, nor the rationale underlying them, prescribe *when* the declarant must testify relative to the admission of the prior consistent statement.

Sections 791(b) and 1236 require that the prior statement be consistent with the declarant's "testimony at the hearing." This requires knowing what the testimony at the hearing will be; it does not necessitate that the testimony occurs before the prior consistent statement is introduced. Defendants argue a court cannot intelligently determine whether an out-of-court statement is consistent with testimony that has not happened yet. That

51

may be true in some civil cases as well as in criminal matters where pre-trial discovery is more limited and defendants have Fifth Amendment rights; in cases where it is unclear what the testimony at the hearing will be or if it will even occur, a court requiring the declarant to testify first makes sense. Here, however, there was no question that Shashi would testify or that when he did, he would say a real estate partnership agreement existed between him and his brothers. Defendants' attack in opening statement concerning this anticipated testimony thus opened the door to the admission of prior consistent statements to rehabilitate Shashi's credibility as to the existence of the real estate partnership.

Importantly, section 791(b) does not include a bright-line rule dictating the order of proof. Except as otherwise provided by law, a trial court has discretion to regulate the order of proof in a trial. (§ 320.) For example, *Kerner v. Peacock Dairies, Inc.* (1933) 129 Cal.App. 686 held that although the admission of a declaration against interest would have been better admitted in rebuttal after the witness had testified, "[t]his goes to the order of proof, which is a matter largely in the discretion of the trial judge, and we can see no abuse of discretion in the admission of evidence out of the usual order." (*Id*. at p. 692.) Where, as here, the express requirements of the Evidence Code are met and a party's case or defense centers upon attacking the declarant's credibility, we see no reason that sections 791(b) and 1236 should limit the trial court's discretion to allow the anticipatory admission of the prior consistent statement, be it for juggling witness availability in a long trial or other reasons.

Defendants cite no binding authority requiring that a declarant testify before his or her prior consistent statement may

be admitted pursuant to sections 791(b) and 1236. Defendants cite *People v. Kopatz* (2015) 61 Cal.4th 62, which held that for a statement to be admissible under sections 791 and 1236, the declarant had to testify at trial. (*Kopatz*, *supra*, at p. 84.) That, obviously, happened here. *Kopatz* does not articulate *when* the declarant had to testify in relation to the admission of the prior consistent statement. (See *id.* at pp. 82-87.)[11]

Defendants cite *U.S. v. Sanchez Solis* (2d Cir. 1989) 882 F.2d 693, 696, footnote 2, *United States v. Strand* (9th Cir. 1978) 574 F.2d 993, 996, footnote 4, and *Chestnut v. Ford Motor Co.* (4th Cir. 1971) 445 F.2d 967, 973 for the proposition that federal courts refuse to admit prior statements if a declarant "had not yet testified." Defendants do not explain why federal jurisprudence concerning prior consistent statements should inform our analysis. Federal Rules of Evidence, rule 801 was enacted 10 years after section 791(b) was enacted, meaning the Legislature cannot have modeled section 791(b) after the federal rule. Further, rule 801(d) of the Federal Rules of Evidence adopts a different approach than does the Evidence Code. Section 791(b) is a hearsay exception, whereas the federal rule treats a declarant-witness's prior statement as *not* hearsay provided that, "The declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . [¶] . . . [¶] . . . is consistent with the declarant's testimony and is offered . . . [¶] . . .

---

[11] Defendants' citation to *Harden v. Skinner & Hammond* (1955) 130 Cal.App.2d 750 is also unpersuasive. *Harden* involved an appeal of an order on a change of venue motion. *Harden* predates the codification of the Evidence Code and in any event makes no mention of the prior consistent statement exception to the hearsay rule or the criteria applicable to it.

to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying . . . ."  (Fed. Rules of Evid., rule 801(d)(1)(B)(i).)

Even if we assume that cases applying Federal Rules of Evidence, rule 801 are relevant here, none of the cases cited by Defendants holds that rule 801(d)(1) of the Federal Rules of Evidence invariably requires that the declarant testify before the admission of a prior consistent statement.  The declarants in *Sanchez Solis* and *Strand* were criminal defendants who typically do not commit to testify, as Shashi did in his opening statement, and who are not subject to pretrial deposition.  (See *Brooks v. Tennessee* (1972) 406 U.S. 605, 610 ["a [criminal] defendant may not know at the close of the State's case whether his own testimony will be necessary or even helpful to his cause.  Rather than risk the dangers of taking the stand, he might prefer to remain silent at that point, putting off his testimony until its value can be realistically assessed"].)  Nothing in either *Sanchez Solis* or *Strand* indicates the trial courts there knew at the time the prior consistent statements were offered that the declarant/defendant would in fact testify.  When it is clear that a witness will be called to testify at trial and the proffered testimony will be consistent with the prior statement, and attacks on the credibility of the witness's forthcoming trial testimony are made in opening statement, rule 801(d)(1) of the Federal Rules of Evidence in fact permits admission of a prior consistent statement *before* the witness testifies.  (*U.S. v. O'Connor* (2d Cir. 2011) 650 F.3d 839, 862-863 [court did not err in admitting prior consistent statement by sexual abuse victim before the victim testified at trial].)

54

Defendants' reliance on *Chestnut v. Ford Motor Co.*, *supra*, 445 F.2d 967 is also unpersuasive. There, the declarant was a third-party eyewitness and automobile passenger involved in the accident underlying the litigation. (*Id.* at p. 973.) Before she testified, her father tried to relate her account of the accident. (*Ibid*.) The district court excluded his testimony as hearsay, and the plaintiff appealed. (*Id.* at pp. 968, 973.) *Chestnut* predated the Federal Rules of Evidence, and at common law, prior consistent statements were admissible only for the nonhearsay purpose of rehabilitating a witness's credibility. (See Richter, *Seeking Consistency for Prior Consistent Statements: Amending Federal Rule of Evidence 801(d)(1)(B)* (2014) 46 Conn. L.Rev. 937, 946.) Although the Fourth Circuit reversed for a new trial on other grounds, it found no error in excluding this testimony. (*Chestnut v. Ford Motor Co.*, *supra*, 445 F.2d at p. 973.) It explained, "Since [the declarant] had not yet testified, her credibility was not under attack, nor had her interest been made to appear, and her father's testimony of a prior consistent statement was inappropriate time-wise." (*Ibid*., fn. omitted.) In other words, there was no charge that her testimony had been fabricated or influenced by improper motive when the hearsay statement was offered. In contrast, here, Defendants' opening statement satisfied the "charge" requirement of section 791(b).[12]

---

[12] Defendants also cite *Nitz v. State* (Alaska Ct.App. 1986) 720 P.2d 55 and *State v. Salter* (Wis.Ct.App. 1984) 346 N.W.2d 318. Both of these appellate courts concluded a trial court should not have admitted a prior consistent statement before the declarant testified because there was insufficient information about whether the prior statement would be consistent with the

55

Defendants cite the century-old case of *People v. McMillan* (1922) 59 Cal.App.785 for the proposition that "[t]he reputation of a witness for truth . . . cannot be supported by such evidence until it has been challenged by evidence produced by the party against whom he has testified." (*Id*. at pp. 786-787.) *McMillan* concerned when evidence of the "defendant's reputation for truth, honesty and integrity" becomes relevant and admissible. (*Id*. at p. 786.) *McMillan* did not discuss hearsay or the admissibility of prior consistent statements. Even if it did, *McMillan* predated the passage of the Evidence Code and, thus, like *Chestnut v. Ford Motor Co.*, *supra*, 445 F.2d 967, had been decided during a time when prior consistent statements were admissible "only to rehabilitate the witness—to support his credibility—and not as evidence of the truth of the matter stated." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (2015 ed.) foll. § 1236, p. 348.) The *McMillan* court observed that "no attempt had been made to impeach [the] defendant as a witness" (*People v. McMillan*, *supra*, at p. 786) and there was, therefore, no occasion to rehabilitate his credibility with evidence of his prior consistent statements. *McMillan* thus offers no guidance here.

---

trial testimony and otherwise probative. (*Nitz v. State*, *supra*, at p. 70; *State v. Salter*, *supra*, at p. 324.) These cases are inapposite given that the trial court here knew Shashi would testify that an oral partnership agreement with his brothers existed. To the extent precedent from other states directly addresses the issue before us, Pennsylvania recognizes that despite a preference for introducing prior consistent statements as rebuttal evidence, "the trial court is afforded discretion to allow anticipatory admission of the prior statement." (*Com. v. Wilson* (Pa. 2004) 861 A.2d 919, 930.)

Lastly, section 791(b) requires a prior consistent statement to have been "made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." Defendants do not contest that the challenged testimony referred to statements by Shashi before Haresh began to deny the partnership in 2001 or 2002.[13]

### 3. *There Was No Prejudice*

Even if the trial court erred in admitting Shashi's prior consistent statements before he testified, Defendants have not demonstrated that prejudice arose from the fact that witnesses testified before Shashi instead of after. Defendants vaguely argue the witnesses "primed" the jury. However, the jurors already knew from the parties' opening statements that Shashi would testify that there was a real estate partnership. Even if the witnesses had testified after Shashi, their testimony still would have corroborated his story.

Defendants also argue that if Shashi were "the only witness claiming the partnership existed," then under *Watson*, there was "more than an abstract possibility" (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, italics omitted, citing *People v. Watson, supra*, 46 Cal.2d at p. 837) that Shashi "might not have convinced the jury." This argument ignores that the

_____

[13] Defendants cite *Tome v. United States, supra*, 513 U.S. 150 to argue that section 1236 does not allow a party to generally " 'bolster[] the veracity of the story told.' " (*Tome, supra*, at p. 158.) However, *Tome* made this statement in the context of considering "whether out-of-court consistent statements made *after* the alleged fabrication, or *after* the alleged improper influence or motive arose, [we]re admissible under [Federal Rules of Evidence, rule 801(d)(1)]." (*Id.* at p. 152, italics added.)

57

third-party testimony still would have come in under Defendants' conception of section 791(b); it just would have been admitted later in the trial. Even if we assume arguendo the prior consistent statement testimony from these third-party witnesses was excluded altogether, Shashi was *not* the only witness claiming the partnership existed. Rajesh and Chetan testified to this fact. Moreover, a handful of the third-party witnesses testified (and Haresh did not object) that *Haresh* told them about the partnership.

Defendants thus have not demonstrated prejudice.

## F. Defendants' Hearsay Challenge to Translations of Audio Recordings Fails

Defendants argue the trial court should have excluded as hearsay the English translations of the Gujarati audio recordings of diamond partnership meetings. As explained below, Defendants failed to timely object and have forfeited this appellate challenge, which is in any event unpersuasive.

### 1. *Additional Background*

#### a. *Chetan Produces Translated Transcripts*

Years before trial, Chetan produced recorded conversations in Gujarati between him, Haresh, Rajesh, and Shailesh, and transcripts of the recordings translated into English. In May 2017, Chetan's attorney informed Defendants' attorney that Chetan planned to use the recordings and transcripts at trial and requested that Defendants advise if there were any errors. Defendants did not respond.

#### b. Jogani X *Ruling*

In 2021, our colleagues in Division Three held that the trial court in the Shailesh action did not abuse its discretion in

58

excluding the recordings and transcripts at trial under section 352.  (*Jogani X*, *supra*, B302360.)  The sole issue before that jury was whether the statute of limitations precluded Shailesh's complaint.  (*Ibid.*)  The defendants argued the evidence should be excluded because it could not be adequately authenticated, was hearsay, and to admit the evidence would violate the policy underlying Penal Code section 632.  (*Ibid.*)  After a section 402 hearing, "the court found there was 'a wealth of [section] 352 issues in terms of admitting' the recordings.  The court voiced its concerns about the recordings' authenticity, chain of custody, and translation, the age of some of the recordings, and California's public policy against using surreptitiously recorded evidence.  Nor was the court convinced the recordings would help the jury decide the issue before it—what Shailesh had reason to know, and when, about Haresh's alleged breach—or that their ability to impeach Haresh was as strong as Shailesh claimed."  (*Ibid.*)  The appellate court affirmed.  It explained, "Had the court excluded the recordings on one of these bases alone, we might agree it erred. . . .  Chetan's proffered testimony was legally sufficient to lay a foundation for the recordings' admissibility. . . .  [¶]  But, the trial court did not exclude the recordings on just one of these bases.  Instead, the court considered the totality of the circumstances and found a 'wealth' of issues under section 352 that weighed against admitting the recordings."  (*Ibid.*, fn. omitted.)

c.    *Defendants File a Motion in Limine*

In March 2022, in this matter, Defendants moved in limine to exclude evidence of the recorded conversations.  They argued that Chetan made the recordings in violation of Penal Code

59

section 632 and that they could not be authenticated. Defendants did not object based on hearsay.

On July 12, 2023, the court heard Defendants' motion. Defendants argued the recordings and transcripts should be excluded as they had been in *Jogani X*. Chetan disagreed, arguing the only issue there was whether the statute of limitations had run on Shailesh's claims. Thus, the challenged evidence was less probative in that trial where the existence of the partnership was not at issue. Chetan also argued his testimony was sufficient to authenticate the recordings, that the recordings were not made surreptitiously, and that Haresh's expert did not find any indication that audio editing programs had been used to modify or alter the files. Chetan pointed out that six years earlier, he had invited Defendants to confer about the evidence prior to trial and Defendants did not respond. Nor did Defendants ask for the files' metadata in discovery. During the hearing, Defendants did not argue the recordings or transcripts were hearsay. The court denied Defendants' motion.

> d. *Defendants Again Argue the Court Should Exclude the Recordings and Transcripts But Do Not Raise the Issue of Alleged Hearsay*

Six weeks into trial, on the eve of Chetan's testimony, Defendants filed a motion for a section 402 hearing to determine the authenticity of the recordings and transcripts. The request did not assert that the evidence was hearsay. Chetan argued that Defendants' motion was an improper motion for reconsideration of the court's in limine ruling.

The court indicated that it would not change its earlier ruling. Defendants observed that their expert was present in the event the court wanted to question him about the reliability of

the recordings, and the court explained, "I appreciate the fact you had him, but he could have been here a long time ago. . . . I'm not going to start taking different evidence and new evidence . . . today of something that I've already ruled on."

Defendants then argued the translator had not followed customary translation procedures. The court asked Defendants why they had not conferred with Chetan's counsel about these issues earlier. Referring to the May 2017 communication from Chetan's counsel (which by this point was six and a half years ago), the court stated, "To not respond and to wait until the morning of when we're doing this in court is not okay and not timely." The court observed that Haresh never denied it was his voice on the recordings or that the translations did not reflect what he said. The court concluded, "My ruling stands."

e. *Chetan's Testimony*

Chetan testified that he, Rajesh, Shailesh, and Haresh met a few times a year to discuss diamond partnership business. He recorded the meetings on his mobile phone because there was a lot of information and he had obtained his brothers' agreement to record. Chetan regularly downloaded the audio files to his computer. From his computer, he copied the files to a thumb drive, which he provided to a transcriber/translator. Chetan assisted the transcriber/translator only as to which party was speaking. He did not alter or modify the recordings. Chetan verified he had listened to the recordings and that they were the recordings he had made of the partnership meetings.

Chetan confirmed that trial exhibits Nos. 21126 and 21127 were true and correct copies of the translated transcripts of the audio recordings he made of the partnership meetings and that they accurately reflected what was said at those meetings. Trial

exhibit No. 21126 included a notarized letter dated January 14, 2016, from the Oriental Languages Bureau in Mumbai, India stating they had provided the translation and that the agency was "recogni[z]ed by [the] High Court, Supreme Court, Consulates, and other leading [a]gencies [and] [c]orporate [h]ouses."

Defendants objected to exhibits Nos. 21126 and 21127 based on foundation and authenticity but not hearsay. The trial court admitted the exhibits.

Chetan testified about the subject matter of certain pages in the transcripts. At one point, Chetan told his brothers that his partnership interest should be greater than 13 percent due to his successful work in Belgium. Because the brothers did not agree to any change, Chetan stated that he wanted to separate from the diamond and stock market businesses, "[a]nd from real estate, I will continue with you till the case is over." Haresh responded, "Okay." Chetan continued, "And when the case is over, I want to be separate from it also." Haresh again responded, "Okay." Chetan stated, "I do not want this. I will pay for my house, that means only one thing is possible. I may be relieved from stock market and diamond market . . . . Whatever I do will be my own and today I am with you as a partner. In real estate, loss, profit, everywhere, I am with you as per my share. I am standing for it till your case is over."

Chetan's counsel then directed Chetan to look at other pages of the translation. Defendants' counsel objected, stating, "I object on the basis of foundation and authenticity. And I may have forgotten to say 'hearsay' when I made my first objection to these transcripts. But for the record, I make that objection also." The court responded, "Thank you. Overruled."

Chetan testified that Shailesh said that his son, Pinkal, made $35 million a year for everybody. Haresh responded to this claim by pretending to be Shailesh speaking to the brothers, saying, "Still you believe that [']my sons [*sic*], Pinkal, earns [$]35 million[']?" before reverting to speaking on his own behalf by stating, "We are talking about pure business and not which company doing what. We are partners. We are not talking as brothers." Chetan testified that in the recording, Haresh disagreed with Shailesh and noted that Pinkal managed properties as part of the real estate partnership. Thus, it was the partnership, not Pinkal, that had made $35 million.

Chetan then played the matching audio clip of Haresh speaking, during which he says in English, "we are partners." Defendants objected on the grounds of authenticity, foundation, and hearsay. The court overruled the objection. After the clip was played, Chetan testified that the arguing voices on the recording were him, Shailesh, and Haresh. Rajesh also testified that Haresh was the person who said "we are partners" in English.

f.    *Defense Forensic Investigator Erik Laykin*

Forensic investigator Erik Laykin testified that Defendants asked him to examine 72 out of 94 audio files, opine as to their provenance and reliability, and review a sample of the translations. He testified the recordings' original metadata was missing and that "[i]t is impossible to determine if the files themselves have been altered because we do not have the original files to compare against."

Laykin testified on cross-examination that he had found evidence that the files had been altered. He was then impeached with contradictory deposition testimony in which Laykin stated

63

that he " 'was not able to observe any specific indications of manual alterations to the files.' " Laykin had further testified in his deposition, " 'We reviewed these files using various software applications, and we were looking to determine if—if we could identify any obvious modification or alterations to the files. But so far, we have not been able to find any . . . indication of that.' "

Laykin confirmed at trial that he did not find any evidence that the files had been spliced or altered or that the audio had been modified. He could not reach a conclusion as to whether the audio files were authentic. Chetan offered evidence that the trial exhibits' metadata showed the recordings were created as early as 2005 or 2006.

Laykin also testified that he hired a Gujarati translator to review a sample of the recordings and transcripts and found no significant translation errors.

2. *Analysis*

a. *General Legal Principles Relating to the Language Conduit Theory*

Defendants do not challenge the court's admission of the recordings themselves. They argue the transcribed translations were hearsay and that Chetan failed to show they fell within the so-called "language conduit" theory, pursuant to which they would not be considered hearsay. (See *Correa v. Superior Court* (2002) 27 Cal.4th 444.)

In *Correa*, our Supreme Court held that "a generally unbiased and adequately skilled translator simply serves as a 'language conduit,' so that the translated statement is considered to be the statement of the original declarant, and not that of the translator." (*Correa v. Superior Court*, *supra*, 27 Cal.4th at p. 448.) Thus, the court adopted the "language-conduit theory,"

64

which states that "if a contemporaneously translated statement fairly may be attributed to the declarant under the particular circumstances of the case, . . . the translation does not add a layer of hearsay." (*Id*. at pp. 457, 463.) Relying on *U.S. v. Nazemian* (9th Cir. 1991) 948 F.2d 522, 527, *Correa* held trial courts must decide whether a translated statement fairly should be considered a statement by the original declarant on a case-by-case basis, by considering a number of factors " 'such as which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements as translated.' "[14] (*Correa, supra*, at p. 458.)

> b.    *Defendants Have Forfeited Their Hearsay Challenge*

We first consider whether Defendants preserved their hearsay challenge for appeal. "[S]ection 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.' " (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20.) "The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence

---

[14] Although *Correa* and *Nazemian* involved contemporaneous oral interpretations and not written translations (see *Correa v. Superior Court, supra*, 27 Cal.4th at pp. 448, 458; *U.S. v. Nazemian, supra*, 948 F.2d at p. 525), all the parties assume the language conduit theory applies here. Thus, so do we.

65

serves to prevent error.  It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice.  It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal."  (*People v. Morris* (1991) 53 Cal.3d 152, 187-188, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) "Pursuant to this statute, ' "[appellate courts] have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." ' " (*Demetrulias*, *supra*, at p. 20.)

Chetan, Rajesh, Shailesh, and Shashi argue that Defendants forfeited the issue because Defendants did not make a timely hearsay objection.  Defendants disagree and cite to the record where their counsel stated during Chetan's examination, more than 10 reporter's transcript pages *after* the translated transcripts had already been admitted, "I may have forgotten to say 'hearsay' when I made my first objection to these transcripts. But for the record, I make that objection also."

Defendants make no effort to explain why their objection was timely.  A timely objection is generally one made when the inadmissible evidence is first offered or at the earliest opportunity.  (E.g., *People v. Boyette* (2002) 29 Cal.4th 381, 423 [where defense counsel allowed the prosecutor to show photographs of victims while questioning witnesses and objected only when prosecutor moved to admit the photographs into evidence, the "objection was not sufficiently timely to preserve the issue [on appeal]"]; *Pineda v. Los Angeles Turf Club, Inc.* (1980) 112 Cal.App.3d 53, 60 [holding an objection made at "almost near the end" of the witness's testimony forfeited the

issue on appeal].)  An objection comes too late if it is made after the court has admitted the evidence and that evidence has been discussed for some time before the jury.  (*People v. Horn* (1960) 187 Cal.App.2d 68, 77.)  Further, an objection made on a different ground cannot operate as a " 'placeholder' " for a later objection. (*People v. Demetrulias*, *supra*, 39 Cal.4th at p. 22.)

Here, Defendants did not argue that the transcripts were hearsay in their motion in limine, in their motion for reconsideration, or when the evidence was offered and admitted at trial.  Rather, they first claimed the transcripts were hearsay after Chetan had already testified at some length about their contents and after the transcripts had already been admitted. Thus, Defendants have forfeited the issue.

### c. *Regardless of Forfeiture, Defendants Have Not Shown the Court Erred in Admitting the Transcripts*

Even if Defendants had not forfeited the issue, the trial court did not abuse its discretion in admitting the transcripts.  As explained above, courts must decide on a case-by-case basis whether the language conduit hearsay exception applies by considering a number of factors, " 'such as which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements as translated.' "  (*Correa v. Superior Court*, *supra*, 27 Cal.4th at p. 458.)

Defendants fail to show that these factors weighed in their favor.  Chetan supplied the translator, but the evidence suggests the translator was "adequately skilled" and there is no evidence that the translator had any motive to mislead or distort what was

67

said on the recordings.  Defendants argue Chetan initially "refused" to identify the translator and, thus, Defendants could not "probe whether the unknown translator had another role . . . or a tangible motive to mislead or distort."  However, they point to nothing in the record showing that they in fact asked Chetan for the name of the translator or that he refused to provide it. Nor do Defendants point to anywhere in the record that they sought information in discovery about the translator's identity or qualifications.  The letter from the Oriental Languages Bureau certifying the accuracy of the translations and explaining the agency was recognized by courts in India operated as prima facie evidence that the translator was a professional translator and not an interested or biased party.  (See *U.S. v. Nazemian*, *supra*, 948 F.2d at p. 527 [that a party provided the translator is insufficient to show bias in the absence of any specific evidence of bias].)

Defendants next argue Chetan never provided the trial court an opportunity to assess the translator's qualifications or language skills.  However, Defendants' belated hearsay objection failed to put Chetan or the court on notice that the language conduit theory was at issue and to have the translator available in court.  In any event, there is sufficient record evidence establishing the adequacy of the translator's skills.  The letter from the Oriental Languages Bureau, which Defendants do not challenge on any basis, indicates that a professional translation agency with skill sufficient to be accepted by the courts in India was used.  Also, Chetan gave the recordings and translations to Defendants six years prior to trial.  Thus, unlike the contemporaneous oral translations in *Correa*, Defendants here had an opportunity to test the accuracy of the translations by comparing them to the recordings.  Indeed, their own expert

68

conducted such an analysis and concluded there were no significant translation errors.

Defendants argue the translations "are riddled with anecdotal observations and errors unbecoming an official translation." They cite portions of the translations that note the speaker used a "quarreling tone" or that "all three are quarreling in loud voice." They further argue that *Jogani X* affirmed the trial court's exclusion of the translations in part because they "did not inspire confidence" as "they were 'replete with spelling errors [and] untranslated words.' " (*Jogani X, supra*, B302360.)

Neither argument demonstrates that the translator's language skills were inadequate. *Jogani X* held the trial court did not abuse its discretion in excluding the recordings and translations pursuant to section 352 where their probative value on the statute of limitations issue tried in that case "was 'really not there.' " (*Jogani X, supra*, B302360.) Here, the evidence is highly probative of the existence of the partnerships, something not at issue in *Jogani X*. That the translator noted his or her observations of the tone of the conversation is not relevant to the accuracy of the translations, and in any event was something the jury could weigh for itself when listening to the tone of the voices on the recordings. As to the spelling errors or grammatical imperfections, Defendants' own expert's testimony that there were no significant translation errors undermines their argument that the translations were not sufficiently accurate.

Defendants argue that a comparison between the transcripts and audio recording where Haresh speaks in English shows that the transcription is faulty. On the recording, the

69

voice Chetan, Rajesh, and the trial court[15] identified as Haresh states, "We are talking pure business." Someone then talks over Haresh, not in English, and Haresh continues, "I get it. We are partners. That's it. We are not [unclear if Haresh stutters or says a different word] brothers." The transcription describes this portion of the recording as Haresh stating, "We are talking about pure business and not which company doing what? We are partners, we are not talking as brothers." The differences between the two are not meaningful enough to suggest that the court abused its discretion in admitting the transcripts. The evidence thus supported finding that the second and third *Correa* factors weighed heavily in Chetan's favor. Neither party addresses the fourth factor, and we conclude that it does not weigh in favor of either party here.

## G. The Trial Court Did Not Err in Permitting Attorney Glass to Testify

At trial, attorney Glass testified as a percipient witness pursuant to a subpoena. Defendants argue the trial court abused its discretion by not excluding Glass's testimony. They acknowledge that under section 962, there is no attorney-client privilege between Glass and Haresh because Glass jointly represented Haresh, Shashi, and one or more of the partnership entities.[16] However, they contend that Glass breached his

---

[15] In its statement of decision, the court found the speaker sounded like Haresh.

[16] Section 962 states, "Where two or more clients have retained or consulted a lawyer upon a matter of common interest, none of them . . . may claim a privilege under this article as to a communication made in the course of that relationship when

70

professional duties of confidentiality and of loyalty by testifying. We conclude Defendants have not demonstrated that the court abused its discretion in allowing Glass to testify.

### 1. *Additional Background*

#### a. *Prior Representation and Motion to Disqualify*

Glass began representing Shashi in the 1980s. Between 1995 and 2002, Glass jointly represented Shashi, Haresh, and at least some of the entity defendants in real estate transactions. In late 2001, Glass learned of a dispute and conflict of interest between Shashi and Defendants relating to their real estate business, which he initially attempted to mediate. (*Jogani V, supra*, B257750.) Despite this conflict of interest, Glass did not resign from his representation of both clients; however, by 2002, he had stopped representing Defendants. (*Ibid.*)

In February 2014, Defendants learned that Glass was assisting Shashi in this matter. They moved to disqualify Glass from acting as counsel for Shashi, to prohibit Glass from communicating with Shashi and his trial counsel about the case, and to prohibit Glass from testifying as a witness at trial. In opposition, Glass offered a compromise: he would agree not to advise or communicate with Shashi or his trial attorney in connection with trial preparation and trial if the court made no findings adverse to him. (*Jogani V, supra*, B257750.) The trial court accepted Glass's offer and denied the motion without prejudice. (*Ibid.*)

---

such communication is offered in a civil proceeding between one of such clients (or his successor in interest) and another of such clients (or his successor in interest)."

71

Defendants appealed, and we held that the trial court abused its discretion by failing to disqualify Glass from representing Shashi "and from assisting [Shashi] and his attorney in their prosecution of the lawsuit against . . . [D]efendants." (*Jogani V*, *supra*, B257750.) As to whether Glass could testify, we explained that portion of the order was nonfinal and not yet appealable. We stated, "[N]othing in this opinion is intended to intimate whether Glass can or should be precluded from testifying at trial as a percipient witness on [Shashi]'s behalf." (*Ibid*.)

b.      *Motion in Limine*

In 2022, Defendants moved in limine to preclude Glass from testifying at trial. They acknowledged that the attorney-client privilege did not bar Glass from testifying because Shashi and Defendants were joint clients. However, they argued that based on *Jogani V*, Glass could not "assist" Shashi in any manner, which would include testifying. They further argued an attorney's duty of confidentiality was broader than the privilege and that California law prohibited Glass from " 'do[ing] anything which will injuriously affect his former client in any manner in which he formerly represented him [or] . . . use against his former client knowledge or information acquired by virtue of the previous relationship.' " (*People ex rel. Deukmejian v. Brown* (1981) 29 Cal.3d 150, 155.)

During the hearing on their motion in limine, Defendants argued Glass was different from the three other attorneys expected to testify at trial—one of whom Defendants planned to call—because in Defendants' view those other attorneys would not offer testimony in conflict with their prior representation. Defendants claimed Glass would violate his continuing duty of

72

loyalty to Defendants by offering testimony contrary to the "underlying purpose" of the representation, which Defendants narrowly defined by reference to letters Glass sent to third parties stating that Haresh was the sole owner of the entity defendants. Shashi argued that under section 962, no attorney-client privilege existed between joint clients and that Defendants failed to cite any law barring Glass from testifying as a percipient witness pursuant to subpoena.

The court declined to bar Glass entirely from testifying, stating, "[H]e can testify. He is subpoenaed; he can testify." The court did not specify the topics about which Glass could ultimately testify when called to the stand, stating Defendants "will object to certain things, I'll rule. We'll see how it goes. It'll just be like any other witness."

On appeal, Defendants do not specify which portions of Glass's lengthy testimony purportedly violated his duties of confidentiality or loyalty to Defendants. They simply state in a general manner that the court erred in allowing Glass "to testify about the formation and existence of the purported real[ ]estate partnership." Their opening brief does cite limited portions of Glass's testimony, and we summarize that testimony below.

Glass first learned that Shashi had formed a 50-50 partnership with his brothers in April 1995. Shashi had asked Glass to come to his house. When Glass arrived, Shashi was with Haresh, Shashi's wife, and Rajesh. Shashi explained to Glass that he and Haresh had reached an agreement and that Haresh would basically step into Julian's shoes. Shashi would have full management control of the properties and arrange to transfer his properties to salvage his portfolio. Haresh would get a preferred return on his investment, and Shashi would not own the

73

properties until the loan was paid back with 12 percent interest. At that point, Shashi's partnership interest would vest, and he would be entitled to 50 percent of both the profits and the value of the portfolio. Shashi would not acquire properties on his own unless he first offered them to the partnership. Haresh would maintain ownership in the partnership entities as security.

During the approximately 30-minute meeting, neither Haresh nor Rajesh disagreed with Shashi's description of the agreement. Haresh told Glass to take all instructions from Shashi. When Glass suggested that they document the agreement, Shashi and Haresh said that they were family and trusted each other. Haresh stated that he was used to handshake deals in the diamond business. For seven years, Shashi and Haresh conducted themselves in accordance with how Shashi described the agreement.

Glass acted as in-house counsel for HK and JK. Thus, he was aware that after the April 1995 meeting, Haresh followed the advice of other counsel and formed Moorepark and Gilu as holding companies for the underlying California entities, such as JK, which would acquire Shashi's properties. Shashi transferred his properties into the partnership entities without receiving compensation for them because it was part of the brothers' agreement.

Defendants objected to the above-described testimony as hearsay, speculation, and lacking foundation. They did not object to any of the testimony as disclosing confidential information or being contrary to Glass's duty of loyalty to Haresh.

2. *Analysis*

Defendants do not argue that a party's former attorney may never testify when subpoenaed. They raised no argument

74

that the three other attorneys for Haresh, Shashi, and others who testified (including one whom Defendants called) breached their duties of confidentiality and loyalty to their clients.[17] Defendants' argument that Glass should not have been permitted to testify thus appears to be based on our holding in *Jogani V* and/or an assertion that particular statements in Glass's testimony violated his ethical duties to Defendants.

    a.    Jogani V *Did Not Preclude Glass from Testifying at Trial*

Defendants first argue that the trial court should have precluded Glass from offering any testimony whatsoever based on *Jogani V*. That opinion held, "Because the undisputed circumstances require Glass's disqualification from advising [Shashi] as his attorney or assisting him with respect to the matters . . . which he formerly represented [D]efendants, the trial court's denial of the disqualification motion was an abuse of discretion. [D]efendants are entitled to an order that Glass is disqualified from representing and assisting [Shashi] in the prosecution of his lawsuit against [D]efendants." (*Jogani V*, *supra*, B257750.) Defendants contend that Glass testifying thus improperly "assist[ed]" Shashi.

Defendants do not cite any authority for the proposition that when an attorney is disqualified from acting as a legal professional, he or she is also precluded from testifying at trial when subpoenaed. Our holding in *Jogani V* did not say that

<hr />

[17] These three additional attorneys assisted Haresh and Shashi in setting up the partnership, negotiating with lenders, handling a lawsuit in the 1990s that involved real estate related entities, and providing tax planning.

75

either.  We held that Glass may not "assist[] . . . *in the prosecution of his lawsuit*," meaning Glass could not act in his capacity as a lawyer for Shashi in the litigation.  (*Jogani V*, *supra*, B257750, italics added.)  *Jogani V* also expressly stated that "nothing in this opinion is intended to intimate whether Glass can or should be precluded from testifying at trial as a percipient witness on [Shashi]'s behalf."  (*Ibid*.)  The contention that *Jogani V* precluded Glass from testifying at trial is meritless.

>    b.    *Defendants Forfeited Their Challenge to Specific Portions of Glass's Testimony*

As explained *ante* (Discussion, subsection F), to preserve for appeal a challenge to the admission of evidence a party must comply with section 353.  That section precludes reversal for erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."  (*Id*., subd. (a); see *People v. Morris*, *supra*, 53 Cal.3d at pp. 187-188.)

Defendants' motion in limine to preclude Glass from testifying argued that "[a]ny testimony Glass can provide will invariably be intertwined with. . . Defendants' confidential information obtained while he was their attorney."  The court declined to prohibit the parties from putting any questions at all to Glass, and instead deferred Defendants' objections to trial so that it could rule on any objection to particular questions in context.

Although the court deferred Defendants' objections until trial, once the trial began Defendants did not make a single objection that any question posed to Glass improperly sought to

elicit confidential client information or information contrary to his duty of loyalty. Nor did they move to strike any part of his testimony as contrary to these duties. The lack of objection not only prevented the trial court from having an opportunity to consider whether any specific portion of Glass's testimony should have been excluded, it leaves us to speculate what portions of Glass's lengthy testimony Defendants challenge as improper. They have thus failed to preserve their objections to Glass's testimony on the basis that it breached his ethical obligations to his former clients. (*People v. Morris, supra*, 53 Cal.3d at p. 190.)[18]

---

[18] Defendants argue for the first time on appeal that like the advocate-witness rule, California Rules of Professional Conduct, rule 3.7, the court should have first considered whether Glass's testimony was genuinely needed. Defendants did not raise this argument in the trial court and therefore have forfeited it. (*JRS Products, Inc. v. Matsushita Electric Corp. of America, supra*, 115 Cal.App.4th at p. 178.) In any event, the case Defendants cite in support of this proposition, *Doe v. Yim* (2020) 55 Cal.App.5th 573, suggests this is a factor for the court to consider in deciding whether to disqualify the attorney—not whether to permit the attorney to testify.

Similarly, Defendants do not argue until their reply brief that section 962 " 'presupposes' that the former joint representation 'was not, itself, a violation of the Rules of Professional Conduct.' " Thus, we do not consider whether a violation of the Rules of Professional Conduct renders the joint-client exception to the attorney-client privilege inapplicable. (*Doe v. California Dept. of Justice, supra*, 173 Cal.App.4th at p. 1115.)

c.   *Even if the Objection Was Not Forfeited, There Was No Reversible Error*

Even if these objections had been preserved, there was no reversible error.  The duty of loyalty does not excuse an attorney witness from complying with a subpoena, or from truthfully answering questions that do not invade privileged matters.  To the contrary, as early as 1889, our courts recognized not only that there is no privilege between joint clients, but also that the clients "stand on the same footing as to the lawyer, and either can compel him to testify against the other as to their negotiations."  (*In re Bauer* (1889) 79 Cal. 304, 312; see *Murphy v. Waterhouse* (1896) 113 Cal. 467, 470; *De Olazabal v. Mix* (1937) 24 Cal.App.2d 258, 262; *Croce v. Superior Court* (1937) 21 Cal.App.2d 18, 20; *Piercy v. Piercy* (1912) 18 Cal.App. 751, 761.)  Nearly 100 years after *In re Bauer*, an appellate court held a trial court should have compelled the attorney for a joint venture to testify about how the plaintiff's name was removed from corporate documents and shares.  (*Hecht v. Superior Court* (1987) 192 Cal.App.3d 560, 567.)  In short, "[I]f an attorney has relevant information he may be compelled to testify even if it is detrimental to his client, unless the information is privileged" (*Romeo v. Jumbo Market* (1967) 247 Cal.App.2d 817, 820), or protected by other doctrines such as work product (e.g., *Lasky, Haas, Cohler & Munter v. Superior Court* (1985) 172 Cal.App.3d 264, 279).

Defendants do not cite any authority to the contrary, and most of the cases they cite do not concern whether an attorney

78

may testify.[19]  Two cases Defendants cite that consider the propriety of attorneys testifying as a Federal Rule of Civil Procedure, rule 30(b)(6) (rule 30(b)(6)) witness or as an expert witness are distinguishable.  *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017 held it was a breach of fiduciary duty for an attorney who had earlier represented one party to then accept employment as a rule 30(b)(6) witness for another party in the same matter.  It explained that the discussion following Rules of Professional Conduct, former rule 3-310(C) indicated the rule targeted not only conflicts of interest arising from "legal representation" but also "all types of legal employment."[20]  (*American Airlines, Inc.*, *supra*, at pp. 1032-1033.)  In *Brand v. 20th Century Ins. Co./21st Century Ins. Co.* (2004) 124 Cal.App.4th 594, the court held an attorney could not testify as an expert witness for an insured

---

[19] Defendants' cases instead involve recitation of truisms that lawyers must adhere to professional standards (e.g., *Libarian v. State Bar* (1943) 21 Cal.2d 862, 865) or involve disqualification issues (*Cain v. Superior Court* (2025) 110 Cal.App.5th 639, 648, 655; *Doe v. Yim*, *supra*, 55 Cal.App.5th at p. 581; *Fiduciary Trust Internat. of California v. Superior Court* (2013) 218 Cal.App.4th 465; *Truck Ins. Exchange v. Fireman's Fund Ins. Co.* (1992) 6 Cal.App.4th 1050, 1057; *Goldstein v. Lees* (1975) 46 Cal.App.3d 614).

[20] In 2018, our Supreme Court approved comprehensive amendments to the Rules of Professional Conduct.  (*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.* (2018) 6 Cal.5th 59, 85, fn. 7.)  The comment following the new rule, Rules of Professional Conduct, rule 1.7, no longer refers to "all types of legal employment," and instead refer to "all types of legal representation."

when he had previously represented the insurance company in 14 different actions and trained its adjusters as to claims handling policies and procedures. (*Id.* at pp. 599-600, 607.) Thus, both matters involved an attorney's *employment* by adverse or potentially adverse clients. In contrast, here, there is no indication that Shashi had hired or paid Glass to testify.[21]

As for the duty of confidentiality, the few citations Defendants provide in their brief to Glass's purportedly "damning" testimony largely concern the April 1995 meeting at Shashi's home between Glass, Shashi, Haresh, and Rajesh. However, Defendants do not explain how Glass's duty of confidentiality to Haresh vis-à-vis his joint client Shashi (or Rajesh, as a putative partner in the entity Glass was to help form)[22] exists when the communications at issue were made in Shashi's and Rajesh's presence. Indeed, as *In re Bauer*, *supra*, 79

---

[21] Defendants also cite *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771 but offer no analysis applying it to the matter here. In *Dietz*, the court was unable to find a logical nexus between the dispute and the privilege and, thus, rejected the defendant-attorney's claim that the case against him should be dismissed. (*Id.* at pp. 795-796.) *Dietz* includes general statements of law about client confidentiality, but it is so factually distinct from what occurred here that it does not provide meaningful guidance.

[22] Defendants' position is that there was no partnership, which makes their claim of confidentiality about what occurred in meetings Rajesh attended even more puzzling. If there was no partnership, then the "involvement of an unnecessary third person in attorney-client communications [here Rajesh] destroys confidentiality." (*Insurance Co. of North America v. Superior Court* (1980) 108 Cal.App.3d 758, 765, italics omitted.)

Cal. 304 recognized, either joint client "can compel [the attorney] to testify against the other as to their negotiations." (*Id.* at p. 312.)

As to the remainder of Glass's testimony that Defendants cite in their brief, Defendants have not demonstrated that its admission was prejudicial. (E.g., *Twenty-Nine Palms Enterprises Corp. v. Bardos*, *supra*, 210 Cal.App.4th at p. 1449 [erroneous evidentiary rulings require reversal only if there is a reasonable probability that the jury would have reached a more favorable result in the absence of the error].) Glass's testimony was largely duplicative of another attorney, Fagan, as to which Defendants raise no appellate objection. Fagan described the partnership structure that Shashi should pursue to overcome his financial troubles in the 1990s and that Shashi told him his brothers agreed to that structure. Fagan further testified that when he described the business relationship between the brothers as he understood it to Haresh, Haresh never corrected him.[23]

## H.     Damages Challenges

### 1.     *Shashi's Damages Expert's Challenged Testimony Was Not Fairly Disclosed to Defendants*

Defendants argue the trial court should have excluded the testimony of Shashi's damages expert, William Ackerman, that Shashi (and by extension Chetan and Rajesh) was entitled to compensatory damages from Haresh's mismanagement of real estate partnership investments during the 2008 financial crisis. More specifically, Defendants argue that Ackerman improperly

---

[23] Because we find no abuse of discretion in the court's evidentiary rulings, we reject Defendants' cumulative error argument as there are no errors to cumulate.

81

testified that Haresh should not have sold investments held by the real estate partnership in 2008 (which resulted in a $445 million capital loss), and that if Haresh had held the investments they would now be worth $1.98 billion by using the S&P 500 index as proxy for investment performance. The jury thereafter awarded Shashi, Chetan, and Rajesh their respective partnership shares of that $1.98 billion.

Defendants argue that Ackerman did not disclose this opinion prior to trial, that Ackerman was not qualified to provide such an opinion, and that the opinion was based on both speculation and an erroneous assumption that Haresh had invested in the S&P 500 or something akin to it. As Defendants' first argument has merit, we do not consider the remainder of Defendants' objections.

### a. *Additional Background*

#### i. Ackerman's Pretrial Report and Deposition

Shashi designated Ackerman, a forensic accounting expert, to testify to his "analysis of the financial records and cash flows of the disputed properties and entities as well as the impact of such work on the disputed properties' valuations and overall damages including rates of return, tracings of monetary benefits not received by [Shashi], and damages calculations and impacts resulting from the acts of . . . Defendants from 1995 to the present[;] . . . The time value of money and appreciation of assets[;] . . . [Shashi]'s damages calculations and the assessment of punitive damages[; and] . . . the work and evaluations done by his team."

Ackerman produced a 706-page document, which included as its first page a summary of six opinions. Item No. 5 stated,

82

"Unaccounted investments as of [December 31, 2015] are $535,529,000. In addition, JK [and] HK realized $445,181,000 of investment losses in 2008."

Ackerman was questioned during an initial deposition on April 21, 2022. With regard to the first sentence of Item No. 5, Ackerman explained he had difficulty figuring out where the $535 million went because Defendants produced only the first page of the brokerage statements. When questioned about the second sentence of Item No. 5 and whether he had "formed an opinion as to the economic loss [Shashi] ha[d] suffered as a result of the denial of his partnership," Ackerman stated, "Well, you have a [$445 million] realized loss in 2008 alone." Ackerman said he did not know if the partnership would have had "such a large realized loss in 2008 if the items—if the excess cash flow and moneys available hadn't been invested into securities but instead had been invested into buildings. Or alternatively the way I look at it is $445 million of corporate assets were usurped just in 2008 alone." Ackerman clarified this opinion was related to "just stocks and bonds that proceeds from the operations of JK and HK appear to have been invested, and significant amounts appear to have been lost." Ackerman did not offer any opinion about future unrealized investment gains if Haresh had not sold investments in 2008. When asked, "[H]ave we covered the totality of your opinion number 5?" Ackerman responded, "I believe we have."

At Ackerman's second deposition on May 4, 2022, Defendants' counsel asked if "all of [Ackerman]'s opinions that [he] intend[ed] to testify to" were included in his one-page written summary. Ackerman responded, "I think the ultimate opinion in our observation is summarized here . . . and to the extent there is some opinion or observation buried in [the detailed work behind

83

the summary], I would probably want to share that too." Counsel again asked whether the page was a summary of all the opinions Ackerman intended to offer at trial. Ackerman testified, "No. As I just told you, this is just the top of the summary. . . . [A]s I said, I don't know what sub-opinions and/or observations I might have." Counsel asked, "Other than what's contained in your 706[-]page binder that you produced, do you intend to offer any opinions regarding [Shashi]'s damages calculations?" Ackerman ultimately responded no.

Ackerman identified Item No. 5 as both an "opinion" and an "observation," meaning the "result of comparing and contrasting select financial information between two documents, so it's . . . a mathematical calculation." The second sentence in Item No. 5 about the $445,181,000 of investment losses in 2008 was "probably [an] observation," which he had extracted from 2011 tax returns showing that amount as a capital loss. He did not have additional information about the loss, such as what type of investment instruments were sold, because he had not been provided with "any broker statements for that period, nor the tax return."

Ackerman described his observation of investment losses as potentially relevant to his damages assessment, saying "$445 million of assets disappeared as a result of probably a fire sale in 2008. The economy wasn't very good. Somebody panicked and sold all this stuff versus holding on to it and watching it appreciate 400 percent up to today." Counsel then asked, "Are you intending to provide an expert opinion at trial in this matter as to what would have been a prudent investment strategy in 2008?" Ackerman testified, "I don't believe I'm intending to . . . provide that." He also denied having been asked to form an

opinion as to a prudent investment strategy for HK and JK in 2008.

Ackerman opined in his second deposition that if Shashi were found to be a 50/50 partner, Shashi should not share in the $445 million loss because Haresh had unilaterally made the relevant investment decisions. Ackerman admitted he did not "know if they could have bought those investments in the first place if they had been 50/50 partners. It could have very well been invested in real estate versus stocks and bonds." He clarified he could not speculate if Shashi would have invested in what Haresh chose to invest in during 2006, 2007, or 2008, and did not know whether, had Shashi had a say in the decision, Shashi would have panicked and sold in 2008; Ackerman nevertheless assumed Shashi would not have.

Defense counsel then asked, "So explain again, if you could, your theory as to how these investment losses would be translated into damages for [Shashi]?" Ackerman responded, "Because in the actual world a decision was made unilaterally which resulted in the loss of $445 million of assets, and in the but for world that may not have been the circumstance. It could have been very different, and to the extent it was very different, that would then translate to a damage." Counsel then asked, "Is there any other theory of [sic] explanation that you have as to how that investment loss could translate into damages?" Ackerman responded, "That's the one I can think of."

Ackerman did not know if HK and JK realized losses in their real estate portfolio between 2008 to 2011. He did not analyze whether, if the money had been invested in real estate, how it would have performed. Ackerman confirmed he would not offer any opinion on whether it would have been better to invest

85

in real estate.  Ackerman also confirmed that other than what he had described, he would not rely on the observation that there were investment losses of $445,181,000 in 2008 for any other opinions at trial.

ii.    Ackerman's Trial Testimony

At trial, Ackerman testified on direct examination about Item No. 5.  Discussing the $445 million realized investment loss, he stated that in 2008 "the stock market fell almost in half, and a lot of people panicked, and evidently Haresh panicked too.  And so, when you have a significant amount of investments, you can sit on them, and if they drop . . . [y]ou can panic and sell or you can stay calm and hope it comes back up."  Because tax returns reflected realized investment losses of $445 million, Ackerman knew investments had been sold.  Counsel then asked Ackerman what he meant by "Haresh had panicked and sold."  He testified, "[A] lot of people did panic.  It turns out, now, in hindsight, that was not the thing to do, not to sell, because the stock market has rebounded tremendously since 2008.  Actually, the smart people would have actually taken whatever cash they had and start buying more stocks in 2008 because they were at very depressed prices . . . [a]nd you would have even made more money."  Ackerman testified that his investment advisor told him to buy more investments during this time.

Shashi's counsel then asked, "And instead of panicking and selling, do you know how much—are you able to tell me how much the stock market went up, generally, between 2008 and now?"  Ackerman answered, "If [Haresh] had not sold and incurred that $445 million loss and had let it sit there and appreciate, and if it was invested in the S&P 500, which is a broad-based 500 biggest public companies in the United States[,]"

86

at which point Defendants interrupted to object that Ackerman's testimony went "beyond the scope of his expert opinion." The court overruled the objection. Ackerman completed his answer, stating, "Today it would be worth $1.98 billion." He further testified that Shashi's partnership share of 50 percent of $1.98 billion would be $990 million. Ackerman stated that although there may be some tax benefit to incurring a loss, "it's never a good idea to lose $445 million and pay your taxes."

For the jury, Ackerman added together each component of Shashi's alleged compensatory damages (excluding the value of the real properties) in two scenarios. In the first, Ackerman included 50 percent of the $445 million loss as damages. In the second, Ackerman replaced that number with the $990 million he estimated Shashi would have received if the investments had not been sold in 2008. In the first scenario, Shashi's total damages related to the real estate partnership were $1,031,437,000; in the second, they were $1,798,846,000.

On cross-examination, Ackerman acknowledged he did not know what the $445 million had been invested in at the time those investments were sold. Ackerman testified, "Because I didn't know the specific companies[,] I just assumed that they would move with the United States economy, which is measured by the S&P 500 index," and that his assumption was reasonable. Ackerman also explained that after he was deposed, he spoke with Shashi to determine what Shashi would have done in 2008, "and [Shashi] had indicated to [Ackerman] that . . . he invested in buildings, not stocks. He may not have even invested in stocks, but he would not have partaken in such a thing." On re-direct, Ackerman also testified that the assumption that Shashi would

87

not have sold the investments in 2008 had been built into Ackerman's opinion at the time of this deposition.

### iii.     Other Trial Proceedings

Shashi did not testify to what he would have done with investments in 2008, or to whether he would have invested in stocks as opposed to real estate.

On January 9, 2024, Defendants filed a motion for mistrial, or in the alternative, for the court to strike Ackerman's undisclosed opinions.  The court denied the motion.

In their verdict, the jury selected Ackerman's larger proposed damages figure of $1,798,846,000 for each of Shashi's claims for breach of contract, breach of fiduciary duty, and intentional misrepresentation.  The jury also indicated Shashi's total monetary damages were $1,798,846,000 based on his 50 percent real estate partnership interest.  The jury awarded Rajesh $359,769,200 in real estate partnership damages, which constituted an award using the same methodology as that for Shashi but based on Rajesh's lesser 10 percent interest in the real estate partnership.  The jury awarded Chetan $233,849,980 in real estate partnership damages based on his 6.5 percent interest in that partnership.

On May 31, 2024, Defendants moved for a remittitur setting Shashi's, Rajesh's, and Chetan's damages to zero or for a new trial.  Relevant here, the court ruled Ackerman's opinion concerning the investment gains had been disclosed at his deposition and that Defendants had failed to timely object at trial that the opinion was speculative or that Ackerman was unqualified to give it.

b.    *General Legal Principles*

Following a demand for the exchange of expert witness information, each party must provide an "expert witness declaration" for witnesses such as Ackerman.  (Code Civ. Proc., § 2034.210, subd. (b).)  The declaration must include certain information, including "[a] brief narrative statement of the general substance of the testimony that the expert is expected to give."  (*Id.*, § 2034.260, subd. (c)(2).)  A trial court must exclude from trial any expert testimony "that is offered by any party who has unreasonably failed to" "[s]ubmit an expert witness declaration."  (*Id.*, § 2034.300, subd. (b).)  This includes when "the narrative statement fails to disclose the general substance of the testimony the party later wishes to elicit from the expert at trial." (*Bonds v. Roy* (1999) 20 Cal.4th 140, 149.)

A trial court should exclude an expert opinion based "on a party's right to rely on the other party's expert's express representation that the opinions expressed during an expert deposition are the only ones that need be met at trial," because in such circumstances "it would be grossly unfair and prejudicial to permit the expert to offer additional opinions at trial."  (*Jones v. Moore* (2000) 80 Cal.App.4th 557, 565-566.)  "[A] party's expert may not offer testimony at trial that exceeds the scope of his deposition testimony if the opposing party has no notice or expectation that the expert will offer the new testimony, or if notice of the new testimony comes at a time when deposing the expert is unreasonably difficult."  (*Easterby v. Clark* (2009) 171 Cal.App.4th 772, 780, italics omitted.)

c.   *The Trial Court Erred in not Excluding Ackerman's $1.98 Billion Lost Investment Gain Opinion*

Defendants argue that Ackerman did not put them on notice that he would testify that Shashi's damages included $990 million in unrealized investment gains based on the performance of the S&P 500 (in other words, his 50 percent partnership share of $1.98 billion).  We agree.

An expert declaration need only "disclose the general substance of the testimony the party later wishes to elicit from the expert at trial."  (*Bonds v. Roy*, *supra*, 20 Cal.4th at p. 149.)  Here, Ackerman's expert declaration and report included a calculation of the $445 million loss, but they gave no indication that he also intended to opine that Haresh should not have sold and that the assets sold at a loss would now be worth $1.98 billion.  Even if we considered the expert declaration to include the possibility of this opinion, Ackerman's answers at deposition did not fairly disclose his $1.98 billion investment loss opinion.  Despite this $1.98 billion amount being greater than any other component of alleged real estate partnership damages, Ackerman mentioned this opinion in a pretrial deposition only as a one-time aside that he immediately cut off at the knees by stating he would not testify about prudent investment strategies in 2008 and beyond, which was a necessary predicate to any opinion about post-2008 gains as an alternative measure of loss for the investments at issue.  Then, when counsel asked for clarification about Ackerman's opinion(s) regarding how the $445 million investment loss might translate into damages for Shashi, Ackerman expressly restricted his opinion to the $445 million

loss and said it was the only theory he intended to offer "as to how that investment loss could translate into damages."

Further, Ackerman never disclosed that he would use the S&P 500 as a proxy for the investments' performance had they not been sold. Nor did Ackerman offer any opinion as to why such a proxy would be appropriate despite not knowing the nature of the original investment,[24] whether Shashi would have invested in the S&P 500, or showing a correlation between the movement of real estate prices after the 2008 financial crisis and the S&P 500 index. When there is more than one rule for the measurement of damages, the "method which is most definite and certain should be adopted." (*A.A. Baxter Corp. v. Colt Industries, Inc.* (1970) 10 Cal.App.3d 144, 160; see *Noggle v. Bank of America*

---

[24] Ackerman, along with Shashi, blamed Defendants for failing to disclose the nature of the original financial investments. However, nothing in the record indicates Shashi ever sought this information in discovery. The document requests discussed above do not include any category that called for the production of HK's and JK's brokerage statements from 2008. As described above, the majority of the damages-related demands were for documents created *after* 2011. Other demands were for documents created between 1994 to 2003. The remainder were for forensic images of email and network servers, personal computers, and the like; documents evidencing payments between Haresh and the deponents; documents relating to section 1031 exchanges; partnership agreements or related correspondence; and documents reflecting the purchase price of real properties owned by the deponents. It was Shashi's burden at trial to prove each element of his claims. That the record on this issue is underdeveloped notwithstanding the magnitude of the award emphasizes the problematic nature of Ackerman's testimony.

(1999) 70 Cal.App.4th 853, 862 [holding the appropriate measure of appreciation damages was not a market criterion but the actual performance of the fund the monies would have been invested in].) Having not timely disclosed Ackerman's intention to use the S&P 500 index as a proxy, Defendants were not given a fair opportunity to respond.

Shashi contends there is no prejudice to Defendants arising from Ackerman's undisclosed testimony that they caused $1.98 billion in losses. To the contrary, there was no other evidence supporting this component of damages in the jury's verdict, which totaled $1.3 billion between Shashi, Rajesh, and Chetan's respective shares of the real estate partnership. That the jury awarded the exact amount Shashi requested that included these allegedly lost investment gains indicates the jury relied on the challenged testimony when awarding damages. Further, Defendants argue, and no party on appeal disputes, Rajesh and Chetan's compensatory damages relating to the real estate partnership included their respective partnership shares of this improperly offered figure.

Both in the trial court and on appeal, Defendants sought a new trial or a remittitur of damages based on their timely objection to the testimony at issue during trial. We agree that such a remedy is appropriate because no admissible evidence supported the jury's award of lost investment gains. "When the evidence is sufficient to sustain some but not all alleged damages, we will reduce the judgment to the amount supported by the evidence." (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533.)

Defendants do not contest that sufficient evidence supported the other components of the jury's economic damages award beyond the lost investment gain amount, and we therefore

do not subject those amounts to remittitur. We apply remittitur to the entirety of the lost investment gains awarded by the jury, and decline to speculate on whether the jury would have awarded some lesser amount (such as the respective partnership shares of the $445 million investment loss) in the absence of Ackerman's testimony on lost investment gains because "we may not insert our own assessment for that of the jury." (*Briley v. City of West Covina* (2021) 66 Cal.App.5th 119, 140, 144.)

We thus vacate the jury's award of economic damages to Shashi, Rajesh, and Chetan relating to the real estate partnership and remand for a new trial on such damages unless Shashi, Rajesh, and/or Chetan accept a reduction of such damages to $808,846,000, $161,769,200, and $105,149,980, respectively, along with any necessary corresponding reduction in prejudgment interest,[25] to account for removal of amounts attributable to Ackerman's lost investment gain figure. As the jury's award of damages to Rajesh and Chetan related to the diamond partnership ($100 million and $65 million, respectively) is unaffected by the error at issue, those amounts are not subject to reduction.

Defendants do not challenge the jury's punitive damages awards. Accordingly, if Shashi, Rajesh, and/or Chetan accept the specified reduction in real estate partnership damages, the punitive damages award will remain as to the accepting party. If any of them instead opts for a new trial on damages related to

---

[25] The record before this court does not indicate whether prejudgment interest was calculated on portions of the $1.98 billion alleged investment gains awarded to Shashi, Rajesh, and Chetan.

the real estate partnership, that individual's respective punitive damages award must be vacated and the amount to be awarded for Defendants' fraud, malice, and/or oppression will be retried along with the economic damages claims. As to Shashi, this will be necessary if he does not accept the remittitur because the punitive damage award as to him was based entirely on the real estate partnership. As to Rajesh and/or Chetan, this will be necessary if either or both do not accept the remittitur as their punitive damages award(s) (unlike those for their economic damages) do not distinguish between diamond partnership and real estate partnership claims.

### 2. *The Court Did Not Err in Not Instructing the Jury as to Offset*

Defendants lastly argue that the trial court erred in refusing to instruct the jury on their affirmative defense of offset. They posit, "Trial testimony revealed that when the diamond partnership dissolved in 2011, the partners received a $200 million distribution. . . . Chetan's undisputed testimony was that Rajesh, Chetan, and Shailesh took that money for themselves; they did not share it with their supposed fourth partner, Haresh. . . . Based on the finding that Haresh had a 48 [percent] stake in that partnership, Haresh was entitled to $96 million of the distribution. . . . The awards to Rajesh and Chetan should have been offset accordingly."

"Setoff [or offset] is an equitable doctrine under which a defendant may offset sums owing to the plaintiff against sums owing from plaintiff to defendant, with the result that the offsetting amounts are cancelled and the defendant is obligated to pay plaintiff only the net amount, if any." (Carr & Schwing, 3 Cal. Affirmative Defense (2d ed. 2025) § 44:1, fns. omitted.) One

94

statutory embodiment of this doctrine, Code of Civil Procedure section 431.70, states, in part, "Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the person's claim would at the time of filing the answer be barred by the statute of limitations." The affirmative defense is not itself a cross-demand. (See *Keith G. v. Suzanne H.* (1998) 62 Cal.App.4th 853, 860 ["A setoff . . . is not a claim for relief"].) "The general rule is that a setoff must rest on a claim enforceable in its own right." (*R. M. Sherman Co. v. W. R. Thomason, Inc.* (1987) 191 Cal.App.3d 559, 563.)

From a legal perspective, we find Defendants' argument difficult to assess because, among other things, they do not identify what instruction applicable to this offset theory they offered below that the court erroneously failed to give.[26] From an evidentiary perspective, there was not substantial evidence supporting the giving of an equitable offset instruction. (*Collins v. Diamond Generating Corp.*, *supra*, 107 Cal.App.5th at p. 1173 & fn. 5.) Defendants claim Chetan testified that Chetan, Rajesh, and Shailesh distributed $200 million worth of diamond partnership assets between themselves but provided none to

---

[26] At trial, Defendants argued the court should give CACI No. 353 or a modified version of it. That instruction concerns loss of profits from breach of contract; it does not apply to the equitable set-off defense they articulate on appeal.

Haresh. Chetan in fact testified that the $200 million in assets distributed were only those that Chetan, Rajesh, and Shailesh had pooled; Haresh continued to hold diamond partnership assets, including a diamond company in Israel, which were worth more than his 48 percent share of the partnership.

Defendants also cite the testimony of Pinkal, Shailesh's son, who assisted in the dissolution of the diamond partnership. But Pinkal testified that Chetan, Rajesh, and Shailesh pooled certain assets, including diamond inventory, valued the assets, and then distributed those assets among them. None of the diamond assets that Haresh had was included in the distribution. In other words, although the three brothers split $200 million arising out of the diamond partnership, the diamond partnership pie was greater than $200 million, and Haresh kept his slice of it. Thus, Defendants have not shown there was any evidentiary basis for an offset instruction.[27]

---

[27] Defendants argue the trial court's reasons for not giving the instruction, including that there was no cross-demand and that Defendants were judicially estopped from seeking an offset, were baseless. However, these were the court's observations during argument, and such preliminary views are irrelevant in light of the court's ultimate decision. (*Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 591 [a court's comments before a final ruling "may never be used to impeach" that ruling].) Ultimately, the court decided that there was no evidence supporting the offset instruction, stating, "I can't put any facts into this that make any sense to me in this case. So I'm going to deny it, and that's the reason why."

In their reply brief, Defendants belatedly argue that the assets Haresh kept might have been less than he was entitled to as a 48 percent owner of the diamond partnership. Defendants

## DISPOSITION

The awards of damages to Shashi, Chetan, and Rajesh relating to the real estate partnership are vacated and the matter is remanded for a new trial as to such damages unless Shashi, Rajesh, and/or Chetan timely file consents in accordance with California Rules of Court, rule 8.264(d) to the following reductions: (1) Shashi's economic damages from $1,798,846,000 to $808,846,000; (2) Rajesh's economic damages relating to the real estate partnership from $359,769,200 to $161,769,200; and (3) Chetan's economic damages relating to the real estate partnership from $233,849,980 to $105,149,980. If a party timely consents to the reduction applicable to him (along with any necessary corresponding reduction in prejudgment interest), the clerk shall file a file-endorsed copy of the consent in the superior court along with a remittitur and, if necessary, the court shall recalculate prejudgment interest. If a party does not file such consent by the time allowed, the judgment is reversed as to that party as to the amount of economic damages relating to the real estate partnership and as to punitive damages, and remanded for a new trial solely on the amount of those damages.

Appeal No. B340239 is dismissed.

---

have forfeited this argument. (*Doe v. California Dept. of Justice*, *supra*, 173 Cal.App.4th at p. 1115.)

The judgments and orders are otherwise affirmed.  Each party is to bear its own costs on appeal.

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.